**THOMAS J. PECK & SONS, INC., Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE OF UTAH, Defendant.**

No. 19527.

Supreme Court of Utah.

May 15, 1985.

Bryce E. Roe, Salt Lake City, for appellant.

David L. Wilkinson, Atty. Gen., Stephen Schwendiman, James L. Backer, Jr., Salt Lake City, for respondent.

HALL, Chief Justice:

Plaintiff (Peck) seeks this review of the order of the Public Service Commission (PSC) which imposed a fine on Peck for illegally operating as a motor carrier of bulk cement.

Peck is engaged in the transportation business both as a common carrier and as a contract carrier of various products. Peck also engages in mining, sales of mineral, farm, and other products, and miscellaneous other activities.

In 1982, Peck agreed to transport bulk cement for Concrete Products Company (CPC), a ready-mix concrete manufacturer. Peck agreed to apply to the PSC for authority to transport bulk cement. CPC had previously used Savage Bros. and W.S. Hatch Co., both certificated to transport bulk cement, to haul its cement.

Peck applied for a certificate in December 1983. Before the application was acted upon, CPC needed some cement. Peck bought the cement from the manufacturer and transported and sold it to CPC. Peck's application was denied in March 1983. Thereafter, Peck and CPC continued to operate in the same manner. Peck would buy the cement based on the anticipated needs of CPC, deliver it directly to CPC from the cement manufacturing plant, and load it into CPC's silos. CPC would then pay Peck for the cement. If CPC was unable to accept delivery of the cement when it arrived, Peck would store the cement at the delivery point in its own trailers or tanks.

The PSC issued an order to show cause, requiring Peck to show why sanctions should not be imposed upon it for its transactions with CPC. At the hearing, Peck moved to disqualify the administrative law judge because the judge had heard and denied Peck's application for a certificate of convenience and necessity to haul bulk cement. The motion was denied. Also over Peck's objection, Savage Bros. and Hatch Co. participated in the hearing, examining and cross-examining witnesses, presenting arguments, and filing memorandums.

The PSC found that Peck had engaged in "a very transparent subterfuge to avoid the requirements of the applicable rules and statutes," and imposed a $25,000 fine, $10,000 to be paid within sixty days, and the remainder suspended upon payment of the initial $10,000 and satisfactory completion of a two-year probation.

■ Peck first challenges the factual determination of the PSC, contending that Peck acted as a private carrier and not as a common or contract carrier in the transportation of the property of others for hire and, therefore, was not subject to the jurisdiction of the PSC. Peck urges this Court, as it did the PSC, that it is not engaged in transportation for hire; that it owns the property transported; that it purchases the property before receiving orders; that it stores the property prior to delivery and bears the risk of loss; and that it is not primarily engaged in the transportation business. Peck describes its agreement with CPC as a reasonable means of supplying bulk cement and contends that there was insufficient evidence to support the conclusion that the agreement was only a subterfuge to evade the law. We are not so persuaded.

The PSC is vested with power and authority to supervise and regulate all common and contract motor carriers.[1] The PSC also has the power and authority, by general order or otherwise, to prescribe rules and regulations pertaining to common and contract carriers.[2]

U.C.A., 1953, § 54–6–1 (Supp.1983) defines common and contract motor carriers:

"Common motor carrier of property" means any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle from place to place, the property of others who may choose to employ him.

"Contract motor carrier of property" means any person engaged in the transportation by motor vehicle of property for hire and not included in the term common motor carrier of property as hereinbefore defined.

In a valid exercise of its authority, the PSC has adopted Regulation No. A67–05–90:3b, which provides:

---

**1.** U.C.A., 1953, §§ 54–6–4 and –11 (Supp.1983).

**2.** *Id.*

No person, partnership, or corporation shall, as a subterfuge and means of evading the Utah statutes governing motor carriers, purchase any commodity from a shipper or shippers, provide transportation for the same, and resell at a price approximating the cost of such goods plus the costs of such transportation.

In this case, it was undisputed, and the PSC specifically found that Peck held a certificate to operate as a common carrier by motor vehicle, but was not authorized to carry bulk cement; that Peck sought such authority, but it was denied; that negotiations between Peck and CPC antedated the aforementioned authority application; and that Peck and CPC considered three options under which Peck would provide the transportation service for CPC, namely, the authority application, a truck leasing arrangement, or Peck's purchasing the bulk cement and reselling it to CPC.

Following the denial of authority by the PSC, Peck and CPC reached an agreement whereby Peck would purchase, haul, and resell to CPC bulk cement at a price equal to the cost of the cement, plus a transportation charge equal to that of other carriers then serving CPC. Pursuant to the agreement, Peck purchased substantial quantities of bulk cement from two plants, Martin Marietta and Lone Star (formerly Utah Portland Cement), at $62.00 per ton, the identical price CPC had been paying for cement purchased from the same suppliers. Peck had never before dealt in bulk cement, and all purchases it made pursuant to the agreement were consigned directly to various CPC plants.

Peck's transportation charges were substantially the same as those proposed at the time of its application for authority to haul to CPC. Also, the rates charged CPC were exactly the same as those charged by two competitors, Savage Bros., Inc., and W.S. Hatch Co.

■ A carrier is generally considered private and, therefore, not subject to PSC regulation if the transportation it provides is incidental to, or a necessary part of, its primary business.[3] Applying this standard to the facts and circumstances of this case, it clearly appears that Peck did in fact engage in a subterfuge to evade the law. Peck had not previously engaged in the bulk cement business. It had neither manufactured nor sold the commodity. A year and a half prior to engaging in the operation complained of, it devised alternative methods of accomplishing its purpose. In its capacity as an existing certificated motor carrier, it applied for additional authority to transport bulk cement. When that authority was denied, it sought to accomplish the same purpose by devising a scheme of purchase and resale. Thus, it is clear that the purpose of Peck's purchase of cement was "solely for the reason of having title during transportation, then selling the items upon delivery, in order to be characterized as a private carrier."[4]

The conclusion that Peck engaged in a subterfuge is further borne out by the fact that the monetary consideration to be paid by CPC was to be the same whether Peck delivered the cement as a contract carrier or as a private carrier under the purported purchase-resale arrangement. Under either plan, CPC was Peck's only customer, and the sum CPC was obligated to pay to Peck was the purchase price of the cement at the plant, plus the fee for transportation. The only profit to Peck was necessarily generated out of the transportation fee.

■ Peck next challenges the constitutionality of the statutory authority of the PSC to impose civil penalties upon carriers which fail to comply with the provisions of

3. *Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. 311, 314–15, 84 S.Ct. 1260, 1262–63, 12 L.Ed.2d 341 (1964); *Lloyd McKee Motors v. New Mexico State Corp. Comm'n*, 93 N.M. 539, 542, 602 P.2d 1026, 1029 (1979). *See also Lamb v. Interstate Commerce Comm'n*, 259 F.2d 358 (10th Cir.1958); *Scott v. Interstate Commerce Comm'n*, 213 F.2d 300 (10th Cir.1954); *Denver & R.G.W.Ry. Co. v. Linck*, 56 F.2d 957 (10th Cir.1932).

4. *McKee, supra* note 3, 93 N.M. at 542, 602 P.2d at 1029.

the Motor Carrier Act. Peck's contention is that the statute does not establish any criteria to guide the PSC in determining the penalty to be imposed. For that reason, Peck argues that the statute constitutes an unconstitutional delegation of either legislative or judicial power.

The challenged provision is set forth in U.C.A., 1953, § 54–7–25, which reads in pertinent part as follows: [5]

(1) Any public utility which violates or fails to comply with any provision of the Constitution of this state or of this title, or which fails, omits or neglects to obey, observe or comply with any order, decision, decree, rule, direction, demand or requirement, or any part or provision thereof, of the commission, in a case in which a penalty has not hereinbefore been provided for such public utility, is subject to a penalty of not less than $500 nor more than $2,000 for each and every offense.

(2) Every violation of the provisions of this title or of any order, decision, decree, rule, direction, demand or requirement, or any part or provision thereof, of the commission, by any corporation or person is a separate and distinct offense, and, in case of a continuing violation, each day's continuance thereof shall be a separate and distinct offense.

(3) (a) . . . .

(b) The civil penalty may be compromised by the commission and such determination shall be appealable by the person alleged to have committed the violation only upon his refusal to pay. *In determining the amount of the penalty* or the amount agreed upon in compromise, *the appropriateness of the penalty to the size of the business of the person charged, the gravity of the violation and the good faith of the person charged in attempting to achieve compliance after notification of the violation shall be considered.* The amount of the penalty when finally determined or the amount agreed upon in compromise may be deducted from any sums owing by the state to the person charged or may be recovered in a civil action in the courts of this state.

(Emphasis added.)

In *Wycoff Company v. Public Service Commission,*[6] the Court addressed the validity of the foregoing statutory provisions and concluded that the PSC may impose a penalty upon a motor carrier for repeated violations of its operating authority. In so doing, the Court duly recognized the competence of the legislature to confer upon the PSC the power to perform functions of a judicial or quasi-judicial nature and to enforce the law and the regulations adopted pursuant thereto by proper administrative procedures. More recently, in *Common Cause of Utah v. Public Service Commission,*[7] the Court reiterated the fact that the administrative process involves an inextricable mixture of legislative, executive, and judicial functions, all of which are necessary in carrying out administrative responsibilities.

In *Wycoff,* the Court drew the distinction between civil penalties imposed for failure to comply with administrative regulations and the penalties imposed for violations of law which may be classified as crimes. Because of their similarity, the Court insisted that a high degree of caution be observed in determining the existence of a criminal violation and that a greater quantum of proof be required than in an ordinary proceeding before the PSC. There being no basis in the law to justify the application of a reasonable doubt standard in determining compliance with administrative regulations, the Court concluded that, because of the nature and purpose of the statute, it was reasonable and practicable to require that the evidence of violation be clear and convincing before the imposition of a penalty would be justified.

**5.** *See also* U.C.A., 1953, § 54–6a–4 (Supp.1983).

**6.** 13 Utah 2d 123, 369 P.2d 283, *cert. denied,* 371 U.S. 819, 83 S.Ct. 34, 9 L.Ed.2d 59 (1962).

**7.** Utah, 598 P.2d 1312 (1979).

Peck is critical of the *Wycoff* decision and contends that the Court either overlooked or disregarded its earlier decision in *Tite v. State Tax Commission.*[8] However, the two cases differ factually as well as in the nature of the legal issues presented.

In *Tite,* the issue presented was not as it is in the instant case, whether the administrative body could impose a civil penalty for violation of an administrative regulation, but rather whether it could impose a criminal penalty for violation of law. In *Tite,* the tax commission imposed a penalty on a retailer for failure to affix and cancel excise tax stamps on ten cartons of Lucky Strike cigarettes. On appeal, the Court held that, while it was within the power of the tax commission to enforce or apply a law, it was without power to make a law for each particular case. Therefore, the tax commission was without authority to fix a criminal penalty at any amount between $10 and $299, as provided by statute, since determination of the amount of a criminal penalty was a legislative function that could not be constitutionally delegated to an administrative body.

In the instant case, the statutory penalty imposed is clearly not a criminal penalty, but is a civil penalty imposed by the PSC in its quasi-judicial capacity for the purpose of enforcing the law and to compel conformance with its regulations governing motor carriers.

Peck's contention that the statute does not establish any criteria to guide the PSC in determining the penalty to be imposed is dispelled by a review of the applicable statutory language.

Section 54–7–25(3)(b) specifically requires that, in determining the amount of the penalty, to be considered are the appropriateness of the penalty to the size of the business of the person charged, the gravity of the violation, and the good faith of the person charged in attempting to achieve compliance.

■ It appears that the PSC appropriately followed the foregoing statutory guidelines. Faced with a total of 212 proven violations, rather than assess the minimum penalty of $500 for each violation, the PSC imposed a penalty of $25,000 and suspended $15,000 thereof upon payment of $10,000 within sixty days. In light of the size of Peck's business operation and the gravity of the numerous operations, together with the lack of good faith in achieving compliance with the regulations, as evidenced by the subterfuge, the penalty imposed was statutorily reasonable and appropriate.

■ Peck's remaining point on appeal challenges the procedure followed by the PSC as being violative of due process. It is first urged that the administrative law judge that heard this matter had previously heard and denied Peck's application for a certificate of convenience and necessity to operate as a contract carrier for CPC, and for that reason, he was biased and prejudged this proceeding. This is urged upon us in the abstract, without specificity, and without any record citation in support thereof. Indeed, a review of the record before us lends no credence to the assertion of bias. Suffice it to say, simply because the administrative law judge denied Peck's application for a certificate, it does not follow that bias crept into the instant proceeding.

■ Peck also urges that the proceedings were tainted by the participation of W.S. Hatch Co. and Savage Bros. Similarly, we find no merit to this contention. U.C.A., 1953, § 54–7–11 affords any public utility the right to complain to the PSC on any of the grounds upon which complaints are allowed to be filed by other parties. Despite Peck's contention to the contrary, both W.S. Hatch Co. and Savage Bros. had a legitimate interest in the proceedings, both being certificated to transport bulk cement and both in direct competition with Peck. Again, in the absence of a record showing of any bias or prejudice occasioned

---

**8.** 89 Utah 404, 57 P.2d 734 (1936).

by their participation in the proceeding, we conclude that there was none.

Affirmed.

STEWART, HOWE, DURHAM and ZIMMERMAN, JJ., concur.