2004 UT 18

**BEEHIVE TELEPHONE COMPANY, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH, Respondent.**

Nos. 20020182, 970290, 20000040.

Supreme Court of Utah.

Feb. 24, 2004.

Alan L. Smith, Salt Lake City, for petitioner.

Sander Mooy, Salt Lake City, for respondent.

DURRANT, Associate Chief Justice:

¶ 1 This petition for review concerns a fine imposed by the Public Service Commission of Utah ("the Commission") against a utility for violation of the utility's tariff. In April 1997, the Commission fined Beehive Telephone Company ("Beehive") $182,500 for improperly charging long distance rates for calls made to local area cellular prefixes in violation of

Beehive's tariff. The Commission initially suspended the fine subject to compliance with its order, but vacated the suspension after Beehive failed to comply with the terms of the suspension. The Commission later reduced the fine to $15,000. On review, Beehive challenges this fine. We affirm in part and remand for further proceedings in accordance with our opinion.

## BACKGROUND

¶ 2 Beehive provides telephone services to customers in central Tooele County, Utah, including the communities of Rush Valley, Terra, Vernon, and parts of Skull Valley. Under Beehive's governing tariff, Rush Valley and Vernon are included within an Extended Area Service ("EAS") territory with Tooele.[1] EAS territories are established by the Commission and allow customers to place unlimited calls within a territory on a flat-rated or set monthly charge, in contrast to toll billing or long distance calling, where each individual call is charged based on the distance between calling areas and the duration of each call. Because EAS territories are not established in terms of geographic regions served by telephone providers, service within an EAS territory may be provided by more than one telephone utility. Thus, by the general terms of Beehive's tariff, except during overflow periods,[2] customers in Rush Valley and Vernon who paid the monthly EAS fee should have been able to call cellular phones with Tooele prefixes for no additional charge.[3] It was Beehive's policy, however, to charge long distance rates for such calls regardless of overflow periods. Beehive explained this practice to its customers in a May 1996 newsletter, in which it stated:

> Several of you have asked why you can't dial 830 xxxx and 840 xxxx [Tooele] numbers toll free anymore. These numbers are assigned to pagers and [c]ell phones. Initially we allowed toll free calling to those numbers but those companies never signed agreements with us to compensate us for the expense of completing those calls to the non-wire line telephone companies operating out of Tooele. *No more. If you wish to call those prefix's [sic] it is only possible by your paying the long distance charge.* Those customers who have deducted the long distance charges to call will be expected to pay the long distance charges to call those numbers.

(Emphasis added.)

¶ 3 On May 10, 1996, the Utah Division of Public Utilities ("the Division") informed Beehive that it had received an informal complaint from a Vernon subscriber that he, and many of his neighbors, were being billed for toll calls to the Tooele 830 prefix and that such action directly violated Beehive's tariff. In reply to the Division's letter regarding "[Beehive's] policy of not allowing use of EAS trunks to Tooele to interconnect with non-wire-line . . . telephone carriers," Arthur W. Brothers, Beehive's CEO, responded that Beehive would open up its EAS circuits "on order of the Commission" but "[would] not plan[ ] to allow such use without a [Commission] order."

¶ 4 On July 8, 1996, the Division filed a petition with the Commission for an order to show cause in response to numerous complaints in the Tooele County area regarding poor quality of service and billing errors, in

---

1. The Tooele area was originally serviced by U.S. West Communications, Inc., but is currently serviced by Qwest, Inc.

2. Beehive's tariff allows it to charge long distance rates for calls made to Tooele prefixes during heavy calling times when EAS circuits are not available.

3. It appears from the record that, at some point prior to the institution of these proceedings, the Commission negotiated an agreement between cellular and wireline companies whereby calls made from wireline phones to cellular phones within any given EAS territory would be treated

as local calls, and vice versa. Throughout these proceedings, Beehive has continued to argue that since it was not a party to this prior arrangement it is under no obligation to treat calls made from wireline phones in Rush Valley and Vernon to cellular numbers with Tooele prefixes as falling within the EAS territory. Because both the record and the argument by Beehive in its brief are inadequate to support this assertion, *see infra* Part IV.A.3, we rely on the Commission's conclusion that Beehive's tariff required it to charge local rates for calls made to cellular numbers with Tooele prefixes.

addition to improper charges to subscribers for landline calls made to cellular phones with prefixes within the Tooele EAS calling area. The Commission granted the Division's petition and directed Beehive to appear before an administrative law judge and show cause why it was (1) "not in violation of Utah Code Ann. [s]ection 54–3–1 for failing to provide adequate service," (2) "not in violation of Commission rule R746–240–4 governing account billing procedures," and (3) improperly "charging subscribers toll charges for local cellular calls."

¶ 5 On August 16, 1996, the administrative law judge issued an order requiring the Division and Beehive to submit a joint statement of factual and legal issues to be addressed at trial. The Division's statement of issues in response to that order stated clearly that one such issue was the fact that Beehive was billing toll charges to subscribers who made local calls to cellular phones with Tooele prefixes. The Division explained that Tooele was in the EAS territory with Rush Valley and Vernon, and that Beehive had no tariff allowing it to charge any differently with respect to cellular services. In its response, Beehive did not deny that it was charging subscribers long distance rates for calls made to Tooele cellular prefixes. In fact, Beehive admitted that it "only allow[ed] access to [Tooele] [c]ellular numbers by the customer dialing 1 + 801 + 7 digits and paying for the call as toll" the same as other long distance calls. Beehive argued instead that it was not obligated to provide EAS service with respect to cellular carriers because it had no contracts with cellular companies to provide such services. In a ruling and notice issued on October 10, 1996, the administrative law judge stated that the issues to be resolved would be limited to, in pertinent part, "Beehive Rush Valley Customers' access to and/or charges for calls to prefixes served by wireless telephone providers."

¶ 6 The hearing to address the various issues alleged in the Commission's order to show cause was held on November 12, 1996.[4] During the hearing, several witnesses testified that they could not call Tooele cellular prefixes without being charged long distance rates, and were forced to dial 1 + 801 + the number before the call would go through. Although there was some evidence presented of overflow periods between approximately 8:30 to 10:30 a.m., and 8:00 to 11:00 p.m., there was also evidence presented that Beehive's policy was to charge long distance rates for calls made to Tooele cellular prefixes regardless of any overflow. For example, in addition to Beehive's previous statements regarding its policy of charging long distance rates to Tooele numbers, Mr. Brothers confirmed a witness's statement that she could not dial a Tooele cellular prefix by simply dialing the 830 prefix plus the number. Mr. Brothers also personally testified that "[he] made the decision that [Beehive was] not going to[,] as a company policy[,] allow calls from competing telephone companies to be made through [Beehive's] system unless [it] had some kind of an agreement with the cellular companies." Beehive also confirms in its brief on this appeal that "some testimony suggested that … something was *blocking* the ability of subscribers to dial the cellular prefixes, requiring customers to place the calls as toll calls."

¶ 7 At the conclusion of the hearing, Beehive moved for a continuance in order to prepare additional testimony and respond to the evidence presented. The administrative law judge allotted Beehive three weeks following the hearing to submit post-hearing briefs, but denied Beehive's request for an additional hearing. The administrative law judge also denied Beehive's subsequent written request for additional time. In neither request did Beehive dispute its practice of charging long distance rates for calls made to Tooele cellular prefixes. Indeed, Beehive acknowledged in its petition for reconsideration that the cellular issue was "a matter of law" and stated that it only wanted additional time "to get evidence into the record to support [its] position that [Beehive] … be permitted to charge … [its] originating access to the cellular customer from Beehive subscribers."

4. Throughout the period leading up to and during this initial proceeding, Beehive was represented by its CEO, Arthur W. Brothers.

¶ 8 The administrative law judge issued his report and order on April 10, 1997, ("April 10, 1997 Order") in which he found that, in addition to various quality of service and billing problems, Beehive had been indisputedly imposing toll charges for calls to Tooele cellular prefixes since March of 1996. Accordingly, the administrative law judge found Beehive to be in violation of Utah Code section 54–3–7 and fined Beehive $182,500 pursuant to Utah Code section 54–7–25, $500 for each day Beehive imposed illegal charges. The administrative law judge suspended the sentence, however, "on condition [that Beehive] compl[y] fully with the requirements of the [April 10, 1997 Order]." If Beehive achieved such compliance, the order stated that the suspension would be permanent; otherwise, the suspension would be vacated and the fine would be "immediately due and payable." Beehive moved for reconsideration, which the Commission apparently denied.[5]

¶ 9 Following the April 10, 1997 Order, Beehive made prompt efforts to comply with the administrative law judge's findings with respect to the quality of service issues. However, after receiving "several inquiries and complaints" from Beehive subscribers that they were continuing to be improperly charged for cellular calls in their EAS calling area, on October 13, 1998, the Division filed another order to show cause why the suspended fine should not be vacated. During subsequent hearings, the Division introduced evidence showing that Beehive had continued to charge subscribers long distance rates for calls made to Tooele cellular prefixes from April 1997 to November 1998. Mr. Brothers testified that Beehive continued to impose long distance toll charges for Tooele cellular prefixes because of his erroneous belief that the April 10, 1997 Order was stayed during the appeal of that order.

¶ 10 Following the hearings and post-trial briefings, the administrative law judge entered his report and order on November 3, 1999 ("November 3, 1999 Order"). The administrative law judge found it was undisputed that Beehive only complied with the April 10, 1997 Order mandating that it "cease charging its subscribers toll for completing calls to numbers served by wireless carriers" after the institution of the Division's October 13, 1998, petition for order to show cause. Although he expressed his reluctance in doing so, the administrative law judge vacated the suspension of the fine and reimposed the $182,500 sanction against Beehive. Beehive petitioned the Commission for review, arguing that the fine imposed was excessive. Upon reconsideration, the Commission agreed. The Commission reasoned that instead of treating each of the 365 days from March 1996 to April 1997 as a separate and distinct violation, it would consider "each monthly billing to be a single violation." Accordingly, the Commission imposed $1,250 for each of the twelve monthly billings and reduced the total fine from $182,500 to $15,000.

¶ 11 Technically, Beehive seeks review of the original $182,500 fine.[6] However, because the Commission has reduced this original fine, we review only the latter $15,000 penalty. This court has jurisdiction pursuant to Utah Code section 78–2–2(3)(e)(i) (2002).

## ANALYSIS

### I. APPELLATE BRIEFING REQUIREMENTS

¶ 12 Before discussing the parties' substantive arguments, we find ourselves compelled to address the necessity of complying with our appellate briefing requirements. "Our rules of appellate procedure clearly set forth the requirements that appellants and appellees must meet when submitting briefs before this court. *See* Utah R.App. P. 24. The rules are easy to understand and offer a step-by-step approach to writing an appellate brief." *MacKay v. Hardy*, 973 P.2d 941,

---

5. No denial by the Commission appears in the record.

6. Beehive originally sought review of the April 10, 1997 Order. Because the Commission instituted further proceedings against Beehive for failure to comply with the April 10, 1997 Order while this first review was still pending, we granted the parties' joint stipulation for temporary abatement pending the outcome of the proceedings before the Commission. This consolidated review now follows.

947–48 (Utah 1998). Unfortunately, the number of briefs filed with both this court and the court of appeals that fail to comply with these briefing requirements are "disconcertingly legion," *id.* at 948 n. 9, and we are forced once again to remind appellants and appellees that compliance with our appellate briefing rules is not discretionary. Compliance is mandatory, and failure to conform to these requirements may carry serious consequences. For example, "[b]riefs which are not in compliance may be disregarded or stricken, on motion or sua sponte by the court." Utah R.App. P. 24(j). Moreover, attorney fees may also be assessed against the offending lawyer whose brief fails to comply. *Id.* In the past, we have not employed this latter penalty with any consistency. However, failure to adhere to these guidelines "increase[s] the costs of litigation for both parties and unduly burden[s] the judiciary's time and energy." *MacKay,* 973 P.2d at 949. Thus, we caution that we may be more inclined to utilize this latter measure against future appellants and appellees who fail to meet the simple and clear requirements provided in the Utah Rules of Appellate Procedure for briefs filed with this court.

¶ 13 In this case, Beehive failed to meet many of the briefing requirements set forth in rule 24 of the Utah Rules of Appellate Procedure. First, Beehive neglected to comply with simple formatting requirements. Beehive did not include "[a] table of authorities with cases alphabetically arranged and with parallel citations, rules, statutes and other authorities cited, with references to the pages of the brief where they are cited." Utah R.App. P. 24(a)(3). Beehive failed to provide either a "citation to the record showing that the issue was preserved in the trial court" or "a statement of grounds for seeking review of an issue not preserved in the trial court." *Id.* 24(a)(5)(A), (B). Beehive neglected to include citations to the record when referring to statements of fact and references to the proceedings below.[7] *See id.* 24(a)(7). Beehive also failed to include a table of contents with its extensive supplemental addendum. *See id.* 24(a)(11).

◼ ¶ 14 Second, portions of Beehive's brief do not meet the substantive rule requirements. Not only did Beehive include facts that were not relevant to the issues presented on appeal, *see id.* 24(a)(7), and include parts of the record that were not of central importance to this appeal, *see id.* 24(a)(11)(C), but its argument section does not consistently "contain the contentions and reasons of the appellant with respect to the issues presented … with citations to the authorities, statutes, and parts of the record relied on." *See id.* 24(a)(9). Specifically, in arguing that the Commission violated Beehive's due process rights, Beehive stated that "[it] believe[d] that, for the most part, the Commission violations of due process [were] obvious and [did] not require supporting citations." However, as "general support" for its analysis, Beehive "refer[red] the Court to the extensive literature treating fines by administrative agencies" by string-citing to seven lengthy law review articles, all without either pinpoint citations or explanation as to why each article was helpful.

¶ 15 Finally, Beehive's attempt to marshal all evidence supporting the administrative law judge's challenged finding was largely ineffective. Rule 24(a)(9) requires "[a] party challenging a fact finding" to "first marshal all record evidence that supports the challenged finding." *Id.* 24(a)(9); *see also Hogle v. Zinetics Med., Inc.,* 2002 UT 121, ¶ 16, 63 P.3d 80 ("[T]o mount a successful challenge to the correctness of … findings of fact, the appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even viewing it in the light most favorable to the court below." (internal quotation and citations omitted)). This marshaling requirement is not an open invitation for appellants to bring us their boxes. Rather, it requires appellants to make relevant determinations of which factual findings are being challenged and to include references to those portions of the record in any appendix or brief. We find

---

7. Beehive cited various portions of the record reproduced in the appendix it provided. However, Beehive failed to cross-reference its appendix to the record, thereby burdening this court with the unnecessary task of searching the lengthy record for materials cited in its appendix.

Beehive's everything-but-the-kitchen-sink marshaling efforts to be almost completely unhelpful and caution strongly against a similar approach by Beehive or others in the future.

¶ 16 When filing an appellate brief before this court, attorneys are responsible for complying with our appellate briefing requirements and for presenting arguments in a coherent, understandable fashion. Consequently, we will disregard those portions of Beehive's brief that we find inadequate. With this in mind, we turn to the substance of the issues raised before us.

## II. STANDARD OF REVIEW

¶ 17 Our review is governed by section 63–46b–16(4) of the Utah Administrative Procedures Act. *See* Utah Code Ann. § 63–46b–16(4) (1997). Accordingly, we will grant relief "only if, on the basis of the agency's record, [we] determine[ ] that a person seeking judicial review has been substantially prejudiced" because, in relevant part, the agency action is unconstitutional; the agency has erroneously interpreted or applied the law; the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court; or the agency action is otherwise arbitrary or capricious. *Id.* § 63–46b–16(4)(a), (d), (g), (h)(iv).

## III. MOTION TO STRIKE THE COMMISSION'S BRIEF

¶ 18 As a preliminary matter, we address Beehive's motion to strike the Commission's brief and to summarily reverse the agency order below. Beehive argues that such action is merited on two independent grounds; namely, that the brief "was not prepared and submitted by the Utah Attorney General's Office" as required by article VII, section 16 of the Utah Constitution and relevant portions of the Utah Code, and that the brief "is not responsive to the issues raised on this appeal." We examine each of Beehive's contentions in turn.

## A. The Commission Is an Independent Agency

¶ 19 Beehive argues that article VII, section 16 of the Utah Constitution mandates that the attorney general bring this action because, according to Beehive, the Commission is an executive agency. The Commission counters that it is an independent agency, and therefore its own independent counsel may represent the Commission in this appeal. We agree with the Commission.

¶ 20 We first addressed the distinction between executive and independent agencies in *Hansen v. Utah State Retirement Board,* 652 P.2d 1332 (Utah 1982). In that case, the attorney general filed an action against various state agencies, including the Utah State Retirement Board and Trust Fund, the Industrial Commission, the State Insurance Fund, and the University of Utah Medical Center, seeking a declaration that the Utah Constitution conferred exclusive authority on the attorney general to act as legal advisor for the agencies. *Id.* at 1334. We reasoned that because the attorney general is an executive department office under article VII, section 1 of the Utah Constitution, the attorney general's constitutional authority is limited to acting as a legal advisor to only "those departments over which [executive officers] have direct supervisory control." *Id.* at 1337. Thus, we explained that whether the attorney general has the power to represent state agencies depends on whether the state agencies are departments over which executive officers have "direct supervisory control," and if not, "whether the [l]egislature has authorized defendants to employ independent counsel." *Id.* at 1338.

¶ 21 In determining whether state agencies are subject to direct executive supervisory control we look to a number of factors, including, but not limited to, whether the agency was established as an independent agency by the legislature, whether the agency is governed by a board or executive officer, whether executive officials play a significant role in agency affairs, and whether the agency receives state funding. *See id.* at 1338–39. No one factor is dispositive to our decision. Thus, in *Hansen,* we held that the State Insurance Fund is an

independent agency even though it is administered by the Director of the Department of Administrative Services, an executive department official, and the State Treasurer acts as custodian of all State Insurance Fund moneys, because it "operates essentially as a private insurance company[,] receives no public moneys[,] pays its own administrative expenses from the premiums received," and holds money in trust that effectively belongs to contributing employers. *Id.* at 1340–41. Likewise, in *Utah Technology Finance Corp. v. Wilkinson,* 723 P.2d 406 (Utah 1986), we held that the UTFC is an independent agency even though it receives state funds, is required to make annual reports to the governor, is subject to annual audits by the state auditor, and is required to give all moneys acquired to the state treasurer as custodian, because it is governed by a board of trustees, as opposed to the governor or any executive department official with direct supervisory control, and it is clear the legislature intended to create an independent, nonprofit public agency. *Id.* at 414–15.

■ ¶ 22 In this case, the Commission is governed by a board of three commissioners, none of whom are subject to any direct executive supervision.[8] The legislature has also clearly established the Commission as an independent agency. Utah Code Ann. § 54–1–1 (2000) ("The [Commission] is established as an *independent agency* ... [and] is charged with discharging the duties and exercising the legislative, adjudicative, and rule-making powers committed to it by law and may sue and be sued in its own name." (emphasis added)). Admittedly, the Commission receives state funding for its administrative expenses, *id.* § 54–1–8 (2000), is required to deposit recovered fines and penalties into the state treasury's general fund, *id.* § 54–7–29 (2000), and must account for all receipts to the state treasurer and state auditor, both of whom are executive officials, *id.* § 54–1–12 (2000). However, given that the legislature clearly intended the Commission to be an independent agency, we do not find the de-

gree of direct supervisory control by any executive official necessary to render the Commission an executive agency.

■ ¶ 23 Having determined that the Commission is an independent agency, we must next examine whether it possesses a clear statutory foundation upon which to employ independent counsel. *See Hansen,* 652 P.2d at 1338. Here, the Commission has been directly authorized to employ independent counsel by the legislature. Section 54–1–6 of the Utah Code specifically provides that the Commission may "hire ... advisory staff to assist the commission in performing the powers, duties, and functions committed to it by statute," including hiring "lawyers, law clerks, and other professional and technical experts." Utah Code Ann. § 54–1–6(1)(a)(i) (2000). Beehive argues that this language authorizes the Commission to hire independent counsel only for advisory, as opposed to prosecutorial, purposes. Given that section 54–1–6 authorizes the Commission to employ legal counsel to help it perform the "powers, duties, and functions committed to it by statute," which include promptly prosecuting public utilities who violate public utility statutes, *see* Utah Code Ann. § 54–7–21 (2000), we reject Beehive's interpretation and hold that the legislature has authorized the Commission to employ independent counsel when prosecuting utilities who violate the Public Utilities Act.

¶ 24 Beehive makes a number of arguments that, notwithstanding this authorization, the Commission is required to use the attorney general based on section 54–7–21 of the Utah Code. That section provides as follows:

> The commission shall see that the provisions of the Constitution and statutes of this state affecting public utilities ... are enforced and obeyed, and that violations thereof are promptly prosecuted and penalties due the state therefor recovered and collected; and to this end it may sue in the name of the state of Utah. *Upon request of the commission,* it shall be the duty of the attorney general to aid in any investiga-

---

8. Although "[a]ny member of the commission may be removed for cause by the governor," Utah Code Ann. § 54–1–1.5 (2000), such removal

power is not equivalent to direct supervisory control.

tion, hearing or trial under the provisions of this title and to institute and prosecute actions or proceedings for the enforcement of the provisions [affecting public utilities]. *Id.* (emphasis added). Beehive argues that the phrase "[u]pon request of the commission" modifies only the language concerning investigation, hearing or trial and does not qualify the language regarding the institution and prosecution of enforcement actions or proceedings. We disagree. Such an interpretation is counter-intuitive. The plain language of the statute clearly indicates that the phrase "[u]pon request of the commission" refers to the entire clause, including the institution and prosecution of enforcement actions.

¶ 25 Beehive argues that reading section 54–7–21 to require use of the attorney general is preferable for a variety of reasons. Beehive first asserts that this interpretation is needed to harmonize section 54–7–21 with the provision in section 67–5–1, which states that "[t]he attorney general shall ... prosecute or defend all causes to which the state, or any officer, board, or commission of the state in an official capacity is a party." *Id.* § 67–5–1 (Supp.2003). Beehive's assertion is incorrect. As we explained in *Hansen,* this general requirement is impliedly limited by Utah Code section 67–5–5, which states that *"[e]xcept where specifically authorized by ... statute* [ ], no agency shall hire legal counsel, and the attorney general alone shall have the sole right to hire legal counsel for each such agency." *Id.* § 67–5–5 (2001) (emphasis added); *see Hansen,* 652 P.2d at 1337. Here, the legislature has specifically authorized the Commission to hire legal counsel by statute. *See* Utah Code Ann. § 54–1–6. Thus, contrary to Beehive's assertions, sections 54–7–21 and 67–5–1 are consistent.

¶ 26 Beehive further argues that reading section 54–7–21 to require the Commission to use the attorney general is preferable because "it makes less general sense of the overall statutory scheme to have Commission counsel perform a prosecutorial or [litigious] role, or, indeed, anything other than the 'advisory' role committed to" Commission counsel by section 54–1–6(1) of the Utah Code. However, as we have previously explained,

the Commission has been authorized by the legislature to employ independent counsel for prosecutorial purposes. *See id.* §§ 54–1–6(1)(a)(i), –7–21.

¶ 27 Finally, we reject Beehive's argument that reading section 54–7–21 to mandate Commission use of the attorney general is "advisable in view of the constitutionally questionable conflicts created when the same agency acts simultaneously as policeman, prosecutor, and judge in the enforcement and collection of fines or penalties." As we will later discuss, agencies have the authority to exercise rulemaking, adjudicative, and prosecutorial functions as long as there is an appropriate internal division of labor between inconsistent functions. *See Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n,* 614 P.2d 1242, 1250 (Utah 1980) (explaining that "separation of functions ... prevent[s] contamination of judging by the performance of inconsistent functions," such as, for example, an administrative proceeding in which an investigator or prosecutor also acts as judge). No inappropriate division occurred here. *See infra* Part IV.A.2.

¶ 28 In summary, we hold that the Commission is an independent agency and has been authorized by the legislature to employ independent counsel to aid it in its prosecutorial functions. Consequently, the Commission is not required to be represented by the attorney general in this matter before us.

### B. *The Commission's Brief Is Sufficiently Responsive*

¶ 29 Having determined that the Commission's independent counsel is authorized to represent the Commission, we next address Beehive's contention that the Commission's brief should be stricken because it is not responsive to the issues raised on this appeal. Beehive argues that the Commission's brief "addresses few, if any," of the issues identified by Beehive in its statement of issues and should therefore "be deemed to have conceded these arguments."

¶ 30 Although the Commission does not address each individual due process violation Beehive asserts on review, the Commission does, to a greater or lesser extent, address each issue raised in Beehive's brief. More-

over, given that portions of Beehive's brief are somewhat difficult to understand, we believe the Commission's brief adequately responds to those issues Beehive discusses in a comprehensible manner. Accordingly, we find Beehive's motion to strike the Commission's brief to be without merit. We turn now to the substantive arguments raised in the parties' briefs.

## IV. ISSUES ARISING FROM THE APRIL 10, 1997 ORDER

### A. Due Process

¶ 31 Beehive makes four arguments alleging various due process violations regarding the Commission's April 10, 1997 Order. Specifically, Beehive contends that (1) it received insufficient notice that fines or penalties could be imposed for violating the Utah Code and Commission Rules; (2) the Commission violated separation of powers by acting in a legislative, executive, and judicial function at various points throughout the proceeding below; (3) Beehive was improperly "bound by a docket to which it was not a party;" and (4) the Commission finding was based entirely upon hearsay. We address each argument in turn.

### 1. Notice

¶ 32 Notwithstanding the notice the Division gave to Beehive from the very outset of the proceedings below that Beehive was violating Utah Code section 54-3-1,[9] Beehive argues it was not directly informed of the possibility that a fine could be imposed as a result of its violations, and that, accordingly, it did not receive the fair notice required by due process. We disagree.

■ ¶ 33 There is no question that fair notice is a central element of due process. *See Gildea v. Guardian Title Co.,* 2001 UT

75, ¶ 12, 31 P.3d 543; *Crank v. State Judicial Council,* 2001 UT 8, ¶ 26, 20 P.3d 307. However, we find that Beehive received adequate notice that a fine could result from its actions. The Division's first order to show cause clearly stated that Beehive was violating section 54-3-1 of the Utah Code in addition to "charging subscribers for local cellular calls" in violation of its tariff. While Beehive was never explicitly informed that its violations could lead to potentially large fines, section 54-7-25 of the Utah Code clearly states that a fine is mandatory if such violations occur:

(1) Any public utility that violates or fails to comply with this title or any rule or order issued under this title . . . is subject to a penalty of not less than $500 nor more than $2,000 for each offense.

(2) Any violation of this title or any rule or order of the commission by any corporation or person is a separate and distinct offense. In the case of a continuing violation, each day's continuance of the violation shall be a separate and distinct offense.

Utah Code Ann. § 54-7-25 (1994). Admittedly, neither the Division nor the Commission specifically alleged that Beehive was violating Utah Code section 54-3-7,[10] the section upon which the administrative law judge predicated the fine. However, both the Division and Commission unequivocally informed Beehive that its policy of charging toll calls violated its tariff. Therefore, Beehive should have been on notice that it was varying from its schedule in violation of section 54-3-7 and would be subject to appropriate penalties under section 54-7-25.

■ ¶ 34 In addition to the broad allegation that Beehive received no notice regarding the possibility that penalties could be imposed for its violations, Beehive also argues that the testimony given by two Divi-

---

9. Many of the code sections in Title 54 were stylistically amended effective July 1, 2001. *See, e.g.,* Utah Code Ann. §§ 54-1-1 to 54-7-30, annotation. Where applicable, we rely on the language of the pre-amendment provisions as they existed during the relevant proceedings below.

10. Section 54-3-7 provides that no public utility shall charge, demand, collect or receive a greater or less or different com-

pensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals and charges applicable to such products or commodity or service *as specified in its schedules [i.e., tariff] on file and in effect at the time.*

Utah Code Ann. § 54-3-7 (1994) (emphasis added).

sion witnesses during the November hearing demonstrates that the service regulations it was charged with violating were "newly minted" and "in the works" as the hearing was being conducted. Beehive argues that, as such, it cannot be fined for violating rules that, at the time of the hearing, were not yet established. This argument is misleading and we reject it. The April 10, 1997 Order addressed three areas of violations: (1) quality of service problems, (2) billing errors, and (3) tariff violations. Although Beehive was ultimately found to have violated Commission rules with respect to its service quality and billing practices, the $182,500 fine was imposed solely because Beehive violated its tariff when it charged its subscribers long distance rates for calls made to cellular numbers with Tooele prefixes. The "service regulations" to which the Division witnesses referred during the hearing concerned only the quality of service issue. They were not the basis on which the administrative law judge determined that Beehive violated its tariff.

¶ 35 Finally, Beehive argues in a footnote that for the Commission to have allowed Beehive to be represented only by Beehive's CEO, Mr. Brothers, and to act without counsel while the Commission knew a fine could be imposed as a result of Beehive's actions raises due process concerns. However, Utah Administrative Code section R746–100–6(B) explicitly allows for such representation by providing that "[i]ndividuals who are parties to a proceeding, *or officers* or employees of parties, may represent their principals' interests in the proceeding." Utah Admin. Code § R746–100–6(B) (Jan. 1, 1996) (emphasis added). No Utah case law forbids this type of representation in administrative proceedings, and other jurisdictions have explicitly upheld similar standards. *See, e.g., Idaho State Bar Ass'n v. Idaho Pub. Utils. Comm'n,* 102 Idaho 672, 637 P.2d 1168, 1172 (1981) (recognizing that representation of a corporation by its officers in administrative proceedings is allowed). Accordingly, Mr. Brothers's representation of Beehive before the administrative law judge was permissible and did not violate due process.

¶ 36 Having determined that no notice violations occurred during the Commission pro-

ceedings below, we next examine Beehive's contention that the Commission violated separation of powers principles.

## 2. Separation of Powers

¶ 37 Beehive appears to argue that the Commission's general ability as an administrative agency to exercise executive, legislative, and judicial powers at various stages of these proceedings violates separation of powers and due process principles. We do not address this argument in any great detail because such a combination of functions has long been upheld as consistent with due process. *See Withrow v. Larkin,* 421 U.S. 35, 58, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (recognizing the combination of functions within an agency, such as prosecutorial and adjudicative, without more, does not violate due process by virtue of being exercised by the same agency); *see also Thomas J. Peck & Sons, Inc. v. Pub. Serv. Comm'n,* 700 P.2d 1119, 1122 (Utah 1985) ("[T]he administrative process involves an inextricable mixture of legislative, executive, and judicial functions, all of which are necessary in carrying out administrative responsibilities." (citation omitted)). Agencies have the authority to exercise rulemaking, adjudicative, and prosecutorial functions, provided that there is "an appropriate internal division of labor" between inconsistent functions. *Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n,* 614 P.2d 1242, 1250 (Utah 1980). Here, Beehive has failed to demonstrate any instance where the Commission failed to internally divide labor among the three functions. Accordingly, we reject Beehive's contention that the Commission violated separation of powers principles.

## 3. Prior Joint Provisioning Arrangements

¶ 38 The third reason Beehive gives for arguing that the Commission violated due process principles is unclear, although Beehive apparently argues that it should not be bound by the "pre–1991 docket" joint provisioning arrangement between wireline and wireless companies. We presume that this arrangement refers to an agreement whereby cellular prefixes were incorporated into EAS local service areas and Beehive became

obligated to include Tooele cellular prefixes within its EAS service area. Beehive asserts that because it did not participate as a party in these prior arrangements, res judicata prohibits it from being bound by those agreements. Because this issue is inadequately briefed, we decline to address it. *See Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 23 n. 9, 48 P.3d 918.

4. Hearsay

¶ 39 Finally, with respect to due process violations, Beehive argues that the Commission's finding that Beehive violated its tariff was based entirely on hearsay and thus violated both the Commission's own rules of procedure, as well as due process. We disagree. Beehive is correct that "a finding of fact cannot be based solely on hearsay evidence, but ... must be supported by a residuum of legal evidence competent in a court of law." *Lake Shore Motor Coach Lines, Inc. v. Welling*, 9 Utah 2d 114, 118, 339 P.2d 1011, 1014 (1959) (internal quotation and citation omitted); *see also* Utah Admin. Code § R746-100-10(F)(1) (Jan. 1, 1996) ("The Commission is not bound by the technical rules of evidence and may receive any oral or documentary evidence; except that no finding may be predicated solely on hearsay or otherwise incompetent evidence."). However, the finding in this case which led to the imposition of the fine was not based on hearsay. Rather, it rested on the admission of a party opponent. Rule 801(d)(2) of the Utah Rules of Evidence states,

> A statement is not hearsay if ... [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity, [or] ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship....

Utah R. Evid. 801(d)(2).

¶ 40 The record is replete with admissions by either Beehive, or Beehive's CEO, Mr. Brothers, that it was charging subscribers long distance rates for calls made to cellular phones with Tooele prefixes. For example, Beehive clearly stated in its issue list to the administrative law judge that "Beehive ... only allows access to those [Tooele] [c]ellular numbers by the customer dialing 1 + 801 + 7 digits and paying for the call as toll." In a letter sent to subscribers in response to subscriber inquiries as to why they were not charged local prices for calling cellular phones with local prefixes, Beehive stated that "[i]f you wish to call [Tooele cellular prefixes] it is only possible by your paying the long distance charges." Mr. Brothers also conceded "for the record" during the November 12, 1996, hearing that Beehive charged calls to the 830 prefix, a Tooele cellular prefix. Because these statements constitute admissions by a party opponent, they are not hearsay and the administrative law judge's decision was adequately supported.

¶ 41 Because we find that the proceedings below comported with due process principles, we next consider whether the Commission adequately proved that Beehive was violating its tariff to justify imposing a fine.

*B. Section 54-7-25 Violations Must Be Established by Clear and Convincing Evidence*

¶ 42 Beehive argues that the fine imposed in this case should be reversed because the Division failed to present clear and convincing evidence of Beehive's tariff violations for each of the 365 days for which the original $182,500 fine was imposed. To a limited extent, we agree.

¶ 43 In *Wycoff Co. v. Public Service Commission*, we recognized that penalties imposed under section 54-7-25 of the Utah Code are "similar in nature and therefore somewhat akin to a penalty imposed for violations of law which may be classified as crimes." 13 Utah 2d 123, 126, 369 P.2d 283, 285 (1962); *see* Utah Code Ann. § 54-7-25 (1994). Because of this similarity, we explained that "a high degree of caution should be observed in determining whether there has been a violation," which we implemented "by requiring a greater quantum of proof than in ordinary proceedings before the Commission." *Wycoff*, 13 Utah 2d at 126, 369 P.2d at 285. Thus, penalties imposed under section 54-7-25 must be proven by

clear and convincing evidence. *Wycoff*, 13 Utah 2d at 126, 369 P.2d at 285–86; *see also Thomas J. Peck & Sons, Inc. v. Pub. Serv. Comm'n*, 700 P.2d 1119, 1122 (Utah 1985) (reaffirming the clear and convincing evidence standard).

¶ 44 In both *Wycoff* and *Peck*, the violations for which each utility was fined were obvious and easily met the clear and convincing standard. For example, in *Wycoff*, the Commission introduced evidence showing that the utility had persistently violated utility restrictions relating to common carriers on thirty-seven different days. 13 Utah 2d at 125, 369 P.2d at 285. And in *Peck*, the Commission established that a common carrier transported bulk cement over two hundred times without a necessary transportation certificate. 700 P.2d at 1120, 1123.

¶ 45 The violations in this case are not as clear as those in *Wycoff* and *Peck*. In his April 10, 1997 Order, the administrative law judge imposed a fine of $182,500 against Beehive—$500 for each of the 365 days Beehive allegedly imposed illegal charges beginning in March 1996 through April 1997. We agree that Beehive's admissions constitute clear and convincing evidence of its violation from March 1996 up to the date of the November 12, 1996, hearing.[11] However, we are concerned by the fact that no evidence was introduced following that hearing upon which the administrative law judge could have determined that Beehive continued to violate its tariff from the November 12, 1996, hearing date to the date the order was issued on April 10, 1997.[12] The only basis upon which the administrative law judge could have concluded that Beehive's violations continued during that time would have been

from Beehive's own statements that it would continue billing long distance rates for Tooele cellular prefixes until it was ordered to do otherwise. Given the similarity between penalties imposed under this section and those imposed for criminal violations of the law, we reject the argument that a mere assumption of a continued violation is sufficient to meet the heightened clear and convincing evidence standard articulated in *Wycoff*. Accordingly, we hold that Beehive may not be charged for violations that occurred after the November 12, 1996, hearing date.

¶ 46 In this case, the Commission reconsidered the $182,500 fine and chose to view each billing cycle as a separate violation. The pattern of billing in the record indicates that Beehive bills customers the first day of every month, which would suggest that Beehive may only be fined for violations that occurred between March and November of 1996. However, because the record does not contain actual billing statements covering this relevant time period, we remand on this issue.

## V. ISSUES ARISING FROM THE NOVEMBER 3, 1999 ORDER

¶ 47 In addition to its arguments challenging the April 10, 1997 Order, Beehive also raises several challenges to the November 3, 1999 Order.

### A. The Commission Had Authority to Vacate the Suspension of Beehive's Fine

¶ 48 We first address whether the Commission had the necessary authority to issue the November 3, 1999 Order in which the Commission vacated the suspension of Bee-

---

11. The Commission failed to introduce evidence showing that Beehive was charging long distance rates at times not covered by its overflow tariff exception. This failure would have been problematic if the Commission had continued to impose a fine based on a day-by-day violation. However, because the Commission later reconsidered and determined that only each billing cycle constituted a violation, we believe Beehive's stated policy of charging long distance rates regardless of any overflow was sufficient to establish by clear and convincing evidence a once-monthly violation up through the November 12, 1996, hearing.

12. The record contains evidence that Beehive continued to violate its tariff by improperly charging long distance rates for calls made to cellular phones with Tooele prefixes during the time period between the November 12, 1996, hearing and the April 10, 1997 Order. *See infra* Part V.D. However, this evidence was not introduced until 1999 when the Division sought to vacate the suspended fine, and therefore could not have been a basis upon which the administrative law judge determined in his April 10, 1997 Order that Beehive had violated its tariff on each of the 365 days from March 1996 to April 1997.

hive's fine. Beehive seems to contend that the Commission lacked subject matter jurisdiction when it issued the November 3, 1999 Order because, according to Beehive, the November 3, 1999 Order was an enforcement action, which should have been "recovered, if at all, in state court[ ] and not before the Commission." Beehive supports its position by repeatedly emphasizing various statutory provisions requiring the Commission to enforce fines through court actions in the name of the state of Utah. *See* Utah Code Ann. § 54–7–18(1) (1994) ("The courts of this state shall consider, hear, and determine all actions and proceedings under this chapter ... in which any question arises under this title or under or concerning any order or decision of the commission ....."); *id.* § 54–7–29 (1994) ("Actions to recover penalties under this title shall be brought in the name of the state of Utah."). The Commission counters that Beehive has misconstrued the proceeding below as an enforcement proceeding when no enforcement action has yet been pursued. We agree with the Commission.

▇▇ ¶ 49 Section 54–7–18 of the Utah Code requires enforcement actions to be instituted in court proceedings, rather than before the Commission itself. *See* Utah Code Ann. § 54–7–18. However, there is no indication that the Commission has sought to enforce the $182,500 fine. On the contrary, the fine originally imposed in the April 10, 1997 Order was suspended, and the November 3, 1999 Order merely vacated that suspension. Any enforcement action to recover the imposed fine has yet to be taken. Therefore the statutory provisions Beehive argues control in this case will not become applicable until the Commission seeks to enforce and collect from Beehive the (now reduced) $15,000 fine.

*B. The Statute of Limitations in Section 54–7–20(2) Will Not Bar the Commission's Enforcement Action*

▇▇ ¶ 50 Beehive argues that because the Commission did not seek to enforce the $182,500 fine within one year of the April 10, 1997 Order, the statute of limitations will bar the Commission from seeking to recover the fine. Beehive relies on Utah Code section 54–7–20(2), which provides, in relevant part, as follows:

> If the public utility does not comply with the order for the payment of reparation within the time specified in such order, suit may be instituted in any court of competent jurisdiction to recover the same. All complaints concerning unjust, unreasonable or discriminatory charges shall be filed with the commission within one year, and those concerning charges in excess of the schedules, rates and tariffs on file with the commission shall be filed with the commission within two years, from the time such charge was made, and *all complaints for the enforcement of any order of the commission shall be filed in court within one year from the date of such order.* The remedy in this section provided shall be cumulative and in addition to any other remedy or remedies under this title in case of failure of a public utility to obey an order or decision of the commission.

Utah Code Ann. § 54–7–20(2) (1994) (emphasis added). The Commission counters that section 54–7–20(2) does not apply in this case, and we agree.

¶ 51 Section 54–7–20(2) and the statute of limitation addressed therein concern *reparations,* not the fines and penalties at issue in this case. This conclusion is supported by the plain language of section 54–7–20(2), which states that "[t]he remedy in this section provided shall be cumulative and in addition to any other remedy or remedies under this title in case of failure of a public utility to obey an order or decision of the commission." *Id.* § 54–7–20(2). Such additional remedies include injunctions, *see id.* § 54–7–24 (1994), and the type of penalties at issue in this case imposed for failure to comply with Title 54, *see id.* § 54–7–25 (1994).

¶ 52 A statute of limitations is an affirmative defense that must be expressly pleaded and proved by the party raising such defense. *See* Utah R. Civ. P. 8(c); *De Vas v. Noble,* 13 Utah 2d 133, 136, 369 P.2d 290, 292–93 (1962). Although there may be an applicable statute of limitations that would bar the Commission from enforcing the penalty in district court, Beehive has failed to identify it, and has consequently failed to

provide us with necessary briefing regarding such a statute. Thus, if a statute of limitation exists that would effectively bar the Commission from enforcing its penalty against Beehive, Beehive must raise that defense before the district court at such time as the Commission seeks to enforce the fine against Beehive.

### C. The Commission Proceeding Is Not Equivalent to a Criminal Contempt Proceeding

¶ 53 As an additional argument against the November 3, 1999 Order, Beehive asserts that the proceeding for recovery of the fine in this case is essentially a criminal contempt proceeding, and thus, it argues, it should have been entitled to more rigorous constitutional protections than it received in the proceedings below. Even if the November 3, 1999 Order were an enforcement order, which it is not, *see supra* Part IV.A, Beehive fails to provide meaningful analysis explaining precisely how enforcement orders are similar to criminal contempt proceedings. Moreover, a review of applicable case law reveals that the penalty imposed in this case is civil in nature—and not equivalent to a penalty for criminal contempt.

¶ 54 The United States Supreme Court recently stated the test for determining whether a statutory penalty is criminal or civil in *Seling v. Young:*

Whether a [statute] is civil or punitive in nature is initially [a question] of statutory construction. A court must ascertain whether the legislature intended the statute to establish civil proceedings. A court will reject the legislature's manifest intent only where a party challenging the [statute] provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the [legislature's] intention.

531 U.S. 250, 261, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (internal citations omitted). The Court "expressly disapproved of evaluating the civil nature of [a statute] by reference to the effect that [statute] has on a single individual," explaining that "courts must evaluate the question by reference to a variety of factors 'considered in relation to the statute

on its face'; the clearest proof is required to override legislative intent and conclude that [a statute] denominated civil is punitive in purpose or effect." *Id.* at 262, 121 S.Ct. 727 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Under this standard, the penalty the Commission assessed against Beehive is clearly civil in nature.

¶ 55 First, the legislature appears to have intended that the penalty in this case be civil. Section 54–7–23 of the Utah Code provides that

[a]ll penalties accruing under [Title 54] shall be cumulative and a suit for the recovery of one penalty shall not be a bar to or affect the recovery of any other penalty or forfeiture, or be a bar to any criminal prosecution against any public utility ... or be a bar to the exercise by the commission of its power to punish for contempt.

Utah Code Ann. § 54–7–23 (1994). By providing that penalties assessed under this section are cumulative, and by listing criminal prosecutions and contempt proceedings separately, the legislature presumably intended for the penalties provided for in section 54–7–25 to be civil. This interpretation is consistent with our decision in *Wycoff Co. v. Public Service Commission,* where we acknowledged that the penalty imposed under section 54–7–25 can be "very burdensome" but explicitly rejected the assertion that such fines were criminal in nature. 13 Utah 2d 123, 126, 369 P.2d 283, 285 (1962).

¶ 56 Second, Beehive has failed to demonstrate that the statutory scheme is so punitive in either purpose or effect that it negates the legislature's intention. In fact, aside from merely stating that contempt proceedings require greater constitutional protections, Beehive fails to provide any analysis explaining why the penalties imposed under section 54–7–25 are similar to contempt proceedings in general. Moreover, even if we were to agree that recovery of the penalties for violating its tariff did entitle Beehive to the full panoply of constitutional protections afforded in criminal contempt proceedings, such an argument at this stage is premature given that the Commission has not yet

sought to recover any penalties for Beehive's violations. Thus, we hold that the penalties imposed in this case are not akin to criminal contempt proceedings and find that Beehive received sufficient constitutional protections in the proceeding below.[13]

### D. Evidence of Beehive's Continued Violations

¶ 57 Finally, Beehive argues that the Division failed to present sufficient non-hearsay evidence that Beehive violated the April 10, 1997 Order by charging long distance rates for calls to Tooele-area cellular prefixes, and that, accordingly, the Commission may not vacate its suspension of the $182,500 fine. Beehive's sole contention rests on a Division audit introduced by Krystal Fishlock, a staff auditor, which showed that Beehive continued to exact illegal charges from its customers following the April 10, 1997 Order. Beehive argues that this audit was hearsay because the individual Beehive records used to compile the audit summary were not introduced into evidence and because Ms. Fishlock was not qualified as an expert.[14] Beehive also argues that it is impossible to determine whether the charges Ms. Fishlock identified as violating the tariff were in fact violations, or whether they occurred during overflow periods during which Beehive's EAS circuits were overtaxed.

¶ 58 Even if we were to accept Beehive's argument that the Division audit was entirely hearsay and that Ms. Fishlock's testimony was insufficient to demonstrate Beehive's continued violations, the record contains at least a residuum of non-hearsay testimony to support the Commission's finding that Beehive violated the April 10, 1997 Order. Admittedly, the fine imposed on Beehive in the April 10, 1997 Order was for violations of its tariff, as opposed to other billing and quality of service concerns. However, the suspension of the fine was expressly conditioned on Beehive's compliance with all the ordered corrections in the April 10, 1997 Order, including the billing and quality of service issues identified in that order. Thus, even if Ms. Fishlock's testimony was entirely hearsay[15] and all long distances charges were, in fact, made during overflow periods, other evidence introduced concerning the billing and service problems that continued past the April 10, 1997 Order was sufficient to justify vacation of the fine's suspension. And in any event, Mr. Brothers admitted in the March 9, 1999 hearing that Beehive continued to charge long distance rates to Tooele cellular prefixes following the April 10, 1997 Order because he erroneously believed that Beehive's appeal stayed that order. This concession is an admission by a party opponent, *see* Utah R. Evid. 801(d)(2), and is sufficient to demonstrate that Beehive was not complying with the April 10, 1997 Order with respect to tariff charges. Accordingly, we find that the evidence presented during the 1999 hearings was adequate to support the Commission's decision to vacate the suspension of Beehive's fine.

### CONCLUSION

¶ 59 We hold that the Commission is an independent agency and has been granted the authority, under Utah Code section 54–1–6, to employ independent counsel to aid it in

---

13. Throughout its brief, Beehive implies that the imposition of the fine in this case was unjustified because its violations were not "wilful" or "malicious." However, because any penalty imposed under section 54–7–25 is civil, not criminal, no *scienter* element is required. Accordingly, Beehive's assertions that its violations were neither wilful nor malicious form no basis for our opinion.

14. Beehive also raises the argument in a footnote that the records were entirely hearsay because they were obtained directly from Beehive in violation of the Rules of Professional Conduct, as well as in violation of an earlier protective order. Because Beehive fails to cite any authority to

support its claim or to explain how the conduct described violated either the Rules of Professional Conduct or Beehive's protective order, Beehive's argument is inadequately briefed and we decline to address it. *See Peterson v. Sunrider Corp.,* 2002 UT 43, ¶ 23 n. 9, 48 P.3d 918.

15. Evidence that is entirely hearsay is admissible during agency hearings. *See* Utah Admin. Code § R746–100–10(F)(1) (Jan. 1, 1996) ("The Commission is not bound by the technical rules of evidence and may receive any oral or documentary evidence; except that no finding may be predicated solely on hearsay or otherwise incompetent evidence.").

performing the powers, duties, and functions committed to it by the legislature. Therefore, the Commission's independent counsel was authorized to represent the Commission in this matter.

¶ 60 Further, we hold that the fine assessed by the Commission against Beehive is not criminal and was not assessed in violation of due process principles. However, we find that the Commission failed to introduce clear and convincing evidence that Beehive continued violating its tariff between November 12, 1996, and April 10, 1997. Because the Commission reduced the fine to reflect only a violation for each billing cycle, we hold that Beehive may only be fined for the billing cycles occurring between March 1996 and November 12, 1996. Since the record does not include billing statements for this relevant time period, we affirm the fine in part, affirm the vacation of the fine's suspension and remand for further proceedings in accordance with this opinion.

¶ 61 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.