2004 UT 76

**STATE of Utah, Plaintiff and Appellee,**

v.

**Thomas Arthur GREEN, Defendant and Appellant.**

**No. 20010788.**

Supreme Court of Utah.

Sept. 3, 2004.

---

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

John R. Bucher, Grant W.P. Morrison, Salt Lake City, for defendant.

W. Andrew McCullough, Trenton K. Ricks, Midvale, for amicus Utah Coalition for Religious Freedom and Tolerance.

Brian M. Barnard, James L. Harris, Jr., Salt Lake City, for amicus Utah Civil Rights and Liberties Foundation.

On Certification from the Utah
Court of Appeals

PARRISH, Justice:

¶ 1 A jury convicted Thomas Green of criminal nonsupport and four counts of bigamy. Green appeals his bigamy convictions. He asserts that they violate the Free Exercise Clause of the First Amendment to the United States Constitution. He also argues that Utah's bigamy statute, Utah Code Ann. § 76–7–101 (1999), is unconstitutionally vague and that the district court erred in applying Utah's unsolemnized marriage statute, Utah Code Ann. § 30–1–4.5 (1999). We affirm.

**1.** "We view the facts in the light most favorable to the jury verdict and recite them accordingly." *State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237.

**2.** For convenience, we refer to the women who have associated with Green by their birth names.

**3.** The district court found that as of the year 2000, Green had six children by Linda Kunz, six children by Shirley Beagley, four children by June Johnson, four children by LeeAnn Beagley, three children by Cari Bjorkman, and two children by Hannah Bjorkman. In addition, at the time of trial, Linda Kunz, LeeAnn Beagley, Cari Bjorkman, and Hannah Bjorkman were pregnant.

**4.** Green participated in a licensed marriage ceremony with Lynda Penman in 1970. Sometime prior to 1984, Green participated in an unlicensed marriage ceremony with Beth Cook. In 1984, Green divorced Lynda Penman. In 1985, Green participated in an unlicensed marriage

## BACKGROUND [1]

¶ 2 An avowed polygamist, Green has participated in simultaneous conjugal-type relationships with multiple women. These women all use Green's surname and have borne children who also use the Green surname.[2] Between 1970 and 1996, Green formed relationships with Lynda Penman, Beth Cook, Linda Kunz, Shirley Beagley, June Johnson, LeeAnn Beagley, Cari Bjorkman, Hannah Bjorkman, and Julie Dawn McKinley. Through his relationships with these women, Green has fathered approximately twenty-five children.[3]

¶ 3 Some of the women entered into licensed marriages with Green. The remaining women participated in unlicensed ceremonies, after which they considered themselves married to Green. Green avoided being in more than one licensed marriage at a time by terminating each licensed marriage by divorce prior to obtaining a license for a new marriage.[4] Green then continued his relationships with each of the women he divorced as if no divorce had occurred.

¶ 4 In 1995, Green and his family moved to Juab County, Utah, where they resided together in a collection of shared mobile homes that the family called "Green Haven." Green quartered in one mobile home, while the women and children quartered in others.

ceremony with Linda Kunz. In 1986, Green participated in an unlicensed marriage ceremony with Shirley Beagley. Green created a licensed marriage between himself and Linda Kunz in 1986. In 1987, Green participated in an unlicensed marriage ceremony with June Johnson. Green divorced Linda Kunz in 1989, and participated in a licensed marriage ceremony with LeeAnn Beagley in 1990. In 1991, Green participated in an unlicensed marriage ceremony with Cari Bjorkman. Also in 1991, Green divorced LeeAnn Beagley and participated in a licensed marriage ceremony with Hannah Bjorkman. Green divorced Hannah Bjorkman in 1995. In 1996, Julie Dawn McKinley, who was underage, received court permission to marry Green, but permission was later rescinded. Though the record is somewhat unclear, it appears that at the time of trial, Lynda Penman, Beth Cook, and June Johnson no longer maintained marital-type associations with Green.

Some of the mobile home areas were set aside as common dining and laundry areas, and the family shared the bathrooms scattered among the mobile homes. The women spent nights individually with Green in his mobile home on a rotating schedule.

¶ 5 Each of the women shared with Green the duties of raising the children and managing the family by dividing the tasks of cooking for the entire family, doing the family laundry, and home schooling all of the children. In addition, the women assisted with the family business, which consisted of selling magazine subscriptions. All money earned by the family business was pooled into "the Green Family Household account."

¶ 6 Between 1988 and 2001, Green appeared on various television shows with the women, consistently referring to the women as his wives, and the women likewise acknowledged spousal relationships. In these television appearances, Green acknowledged that his conduct was potentially punishable under Utah criminal statutes.

¶ 7 In April 2000, the State filed an information charging Green with, among other things, four counts of bigamy. Prior to a preliminary hearing on the charges, the State filed a motion asking that the court recognize the existence of a valid marriage between Green and Linda Kunz. The State based its motion on section 30–1–4.5 of the Utah Code, which codifies common law marriage principles, *Whyte v. Blair*, 885 P.2d 791, 793–94 (Utah 1994), and allows for the finding of a valid marriage in the absence of solemnization.[5] In response to the motion, the district court held an evidentiary hearing in which Linda Kunz was allowed to intervene.

¶ 8 On July 10, 2000, the district court issued a memorandum decision declaring that Green and Linda Kunz were legally married pursuant to section 30–1–4.5. Specifically, the district court found that as of November 2, 1995 (the date on which Green divorced Hannah Bjorkman), both Green and Linda Kunz were single, were capable of giving consent to be married, and otherwise satisfied the requirements of section 30–1–4.5 for creating a valid unsolemnized marriage. Accordingly, the district court found that Green and Linda Kunz shared a valid marriage as of November 2, 1995.[6] The district court also found probable cause to bind Green over on the four bigamy charges.

¶ 9 After the district court issued its memorandum decision, the State amended its information against Green to alter the charging dates for the bigamy counts to a specific five-year period: November 1995 to November 2000. The information alleged that Green cohabited with Shirley Beagley, LeeAnn Beagley, Cari Bjorkman, and Hannah Bjorkman while legally married to Linda Kunz in violation of Utah Code section 76–7–101.

¶ 10 The charges against Green were tried to a jury in March 2002. The jury convicted Green on all four bigamy counts. Green filed a motion for a new trial, which the district court denied. Green thereafter filed a timely notice of appeal. The court of appeals certified the appeal to this court pursuant to section 78–2–2(3)(b) of the Utah Code. Utah Code Ann. § 78–2–2(3)(b) (2002).

5. Section 30–1–4.5 provides as follows:
(1) A marriage which is not solemnized according to this chapter shall be legal and valid if a court or administrative order establishes that it arises out of a contract between two consenting parties who:
(a) are capable of giving consent;
(b) are legally capable of entering a solemnized marriage under the provisions of this chapter;
(c) have cohabited;
(d) mutually assume marital rights, duties, and obligations; and
(e) who hold themselves out as and have acquired a uniform and general reputation as husband and wife.
(2) The determination or establishment of a marriage under this section must occur during the relationship described in Subsection (1), or within one year following the termination of that relationship. Evidence of a marriage recognizable under this section may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.
Utah Code Ann. § 30–1–4.5 (1999).

6. In *Whyte*, 885 P.2d at 793–94, this court explained that under section 30–1–4.5 of the statute, a court can find that a valid marriage was previously entered into and lawful as of that time: "An order entered today may establish that a marriage was contracted and in existence sometime in the past." *Id.* at 793.

## ANALYSIS

### I. APPELLATE BRIEFING REQUIREMENTS

¶ 11 Before addressing the substance of the arguments Green raises on appeal, we pause to review the importance of complying with appellate briefing requirements. " 'Our rules of appellate procedure clearly specify the requirements that litigants must meet when submitting briefs to this court. *See* Utah R.App. P. 24. The rules are easy to understand and offer a step-by-step approach to writing an appellate brief.' " *Beehive Tel. Co. v. Pub. Serv. Comm'n,* 2004 UT 18, ¶ 12, 89 P.3d 131 (quoting *MacKay v. Hardy,* 973 P.2d 941, 947–48 (Utah 1998)). Rule 24 of the Utah Rules of Appellate Procedure contains unambiguous requirements for a brief's organization and contents. Failure to adhere to these requirements " 'increase[s] the costs of litigation for both parties and unduly burden[s] the judiciary's time and energy.' " *Id.* (quoting *MacKay,* 973 P.2d at 949). Failure to adhere to the requirements may invite the court to impose serious consequences, such as disregarding or striking the briefs, or assessing attorney fees against the offending lawyer. Utah R.App. P. 24(j).

¶ 12 In this case, Green has failed to comply with the requirements of rule 24. Green's table of authorities lacks "references to the pages of the brief where [the authorities] are cited," Utah R.App. P. 24(a)(3), and Green does not articulate the applicable standards of appellate review for each of the issues raised as required by rule 24(a)(5). Green also fails to provide either a "citation to the record showing that [each] issue was preserved in the trial court" or "a statement of grounds for seeking review of an issue not preserved in the trial court." Utah R.App. P. 24(a)(5)(A), (B). In addition, Green's citations to the record are selective in contravention of rule 24(a)(7), which provides that "[a]ll statements of fact and references to the proceedings below shall be supported by citations to the record."

¶ 13 Green's most egregious deficiency is his failure to adequately brief the majority of the arguments that he raises on appeal. Rule 24(a)(9) states that an appellant's brief "shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." "Implicitly, rule 24(a)(9) requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Thomas,* 961 P.2d 299, 305 (Utah 1998). As we have noted many times before, "this court is not a depository in which the appealing party may dump the burden of argument and research." *State v. Gamblin,* 2000 UT 44, ¶ 6, 1 P.3d 1108 (quotations and citations omitted).

¶ 14 Taking a shotgun approach to his appeal, Green's brief identifies thirty-nine separate issues for our review. The "argument" for eight of these issues consists of nothing more than a heading and the statement "[t]his issue will not be briefed at this time." For another three issues, the argument consists merely of a heading and a reference to another part of the brief. Many of Green's remaining issues receive only one paragraph of argument or argument that recites facts and states a desired outcome, but is devoid of authority to explain the legal basis for the desired outcome. In those rare instances where Green does cite authority, he fails to provide any pinpoint citations that would assist the court in locating the relevant statements or holdings claimed to be supportive of his position.

¶ 15 "It is well established that a reviewing court will not address arguments that are not adequately briefed." *Thomas,* 961 P.2d at 304. Consequently, we will restrict our review of this case to those issues to which Green has devoted sufficient attention for us to conduct an informed, meaningful analysis. Only three of Green's arguments on appeal meet this standard. They consist of Green's claims that (1) Utah's bigamy statute violates his federal constitutional right to free exercise of religion; (2) Utah's bigamy statute is unconstitutionally vague in light of Green's conduct; and (3) the State's use of Utah's unsolemnized marriage statute to establish a legal marriage between Green and Linda Kunz was improper. We will review each of these claims in turn.

## II. FREE EXERCISE OF RELIGION CLAIM

¶16 Utah's bigamy statute provides, in relevant part, as follows:

A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person.

Utah Code Ann. § 76–7–101(1) (2003). Green argues that this statute is unconstitutional under the First Amendment to the United States Constitution because it punishes his marital practices in violation of his right to freely exercise his religion.[7] Specifically, Green argues that a law effectively prohibiting religiously motivated bigamy (which we refer to as polygamy) cannot withstand a challenge under the standards articulated by the United States Supreme Court in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Green's constitutional challenge to a statute presents questions of law, which we review for correctness. *Provo City Corp. v. Thompson*, 2004 UT 14, ¶5, 86 P.3d 735.

¶17 The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Free Exercise Clause was made applicable to the states by incorporation into the Fourteenth Amendment. *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The scope and contours of the Free Exercise Clause have been defined over time by the United States Supreme Court. These cases inform our analysis and mandate the conclusion that Utah's bigamy statute does not violate the First Amendment as interpreted by the United States Supreme Court for the following reasons.

¶18 First, Green is not the first polygamist to launch an attack on the constitutionality of a law burdening the practice of polygamy. In 1878, polygamist George Reynolds challenged the constitutionality of the Morrill Antibigamy Act, which prohibited bigamy in all territories of the United States. *Reynolds v. United States*, 98 U.S. 145, 145, 162–67, 25 L.Ed. 244 (1878); *see also Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 926 (Utah 1993). Reynolds argued that he could not be found guilty under the law inasmuch as he believed that marrying more than one woman was his religious duty. *Reynolds*, 98 U.S. at 161–62. The Supreme Court held that the law did not violate the Free Exercise Clause of the First Amendment, finding, in part, that "[l]aws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." *Id.* at 166, *quoted in Smith*, 494 U.S. at 879, 110 S.Ct. 1595. Otherwise, reasoned the Court, "professed doctrines of religious belief [would be] superior to the law of the land, and in effect ... permit every citizen to become a law unto himself." *Id.* at 167. The Supreme Court reviewed the practice of polygamy, found it to be socially undesirable, and upheld Reynolds' bigamy conviction. *Id.* at 168.

¶19 We are cognizant of the fact that *Reynolds* was decided over a century ago and may be antiquated in its wording and analysis. We are similarly cognizant of the fact that its reasoning may not necessarily comport with today's understanding of the language and apparent purpose of the Free Exercise Clause. Nevertheless, the Supreme Court has never explicitly overruled the decision. To the contrary, the Court has cited *Reynolds* with approval in subsequent cases, evidencing its continued validity. *See, e.g., Hialeah*, 508 U.S. at 535, 113 S.Ct. 2217 (citing *Reynolds* for the proposition that "a social harm may have been a legitimate concern of government for reasons quite apart from discrimination"); *Smith*, 494 U.S. at 878–79, 110 S.Ct. 1595 (discussing *Reynolds* in explaining that the Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate"); *United States v. Lee*, 455 U.S.

---

7. In this regard, we note that Green's free exercise claim is based solely on the provisions of the United States Constitution. Green raises no claim under the religious liberty provision of the Utah Constitution. *See* Utah Const. art. I, § 4.

252, 257, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (citing *Reynolds* as support for the statement that "[n]ot all burdens on religion are unconstitutional"); *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (citing *Reynolds* for the proposition that "it is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers"); *Cleveland v. United States*, 329 U.S. 14, 20, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (citing *Reynolds* and upholding Mann Act convictions for transporting women across state lines for the purpose of making each woman a plural wife or cohabiting with her as such, despite a challenge based on the Free Exercise Clause); *see also Potter v. Murray City*, 760 F.2d 1065, 1066–70 (10th Cir.1985) (recognizing the continued validity of *Reynolds*, finding that the state had a compelling interest in prohibiting bigamy, and affirming the ruling that the discharge of a police officer based on the officer's practice of polygamy did not violate the officer's right to free exercise of religion). This court is therefore unable to disregard the United States Supreme Court's holding in *Reynolds*.

¶ 20 Second, even if this court were required to extend its analysis beyond *Reynolds*, Utah's bigamy statute would survive a federal free exercise of religion challenge under the most recent standards enunciated by the United States Supreme Court. In *Smith*, the Court held that the state of Oregon did not violate the Free Exercise Clause of the First Amendment to the United States Constitution when it refused unemployment benefits to certain practitioners of the Native American religion who had been fired for illegally using peyote. 494 U.S. at 890, 110 S.Ct. 1595. The Court announced that a neutral law of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Id.* at 878–80, 110 S.Ct. 1595.

¶ 21 The Court applied and expounded on the rule enunciated in *Smith* in *Hialeah*. In *Hialeah*, the Court reviewed various ordi-

nances of the City of Hialeah that effectively prohibited members of the Santeria religion from sacrificing animals, a traditional practice of Santeria worship. 508 U.S. at 524–28, 113 S.Ct. 2217. Drawing from its holding in *Smith*, the Court emphasized the principle that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531, 113 S.Ct. 2217 (citing *Smith*, 494 U.S. 872, 110 S.Ct. 1595). The Court then examined the Hialeah City ordinances and found that they were neither neutral nor of general applicability. *Id.* at 532–46, 113 S.Ct. 2217. Instead, the ordinances were written in such a way as to target only those animal killings that occurred attendant to Santeria religious worship. *Id.* at 535–36, 542–46, 113 S.Ct. 2217. The Court found additionally that the city had no compelling governmental interest to support the ordinances. *Id.* at 546–47, 113 S.Ct. 2217. Consequently, the Court invalidated the ordinances as violative of the Free Exercise Clause of the First Amendment. *Id.* at 547, 113 S.Ct. 2217. We follow the analysis set forth by the Court in *Hialeah* and, accordingly, examine Utah's bigamy statute to determine whether it is neutral and of general applicability.

¶ 22 According to *Hialeah*, a law is not neutral if the object of the law "is to infringe upon or restrict practices because of their religious motivation." *Id.* at 533, 113 S.Ct. 2217. We determine whether a law has this impermissible object by assessing the law's facial and operational neutrality. *Id.* at 533–40, 113 S.Ct. 2217. Facial neutrality is assessed by examining the law's text, *id.* at 533, 113 S.Ct. 2217, while operational neutrality is assessed by examining the law "in its real operation," *id.* at 535, 113 S.Ct. 2217. We begin by looking at the law's text, "for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* at 533, 113 S.Ct. 2217. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

¶ 23 In *Hialeah*, the church argued that the city ordinances prohibiting animal kill-

ings were not facially neutral because they used the words "sacrifice" and "ritual." The Court disagreed, however, explaining that while the words "sacrifice" and "ritual" have religious origins, their "current use admits also of secular meanings." *Id.* at 534, 113 S.Ct. 2217. In addition, the ordinances defined " 'sacrifice' in secular terms, without referring to religious practices." *Id.*

¶ 24 Similarly, in the case now before us, Green and amici curiae argue that Utah's bigamy statute is not facially neutral. They contend that use of the word "cohabit" in the statute's text amounts to impermissible targeting of the religiously motivated marital practices of polygamists. In furtherance of their contention, Green and amici assert that "cohabit" must be read as plainly referring to polygamists because Utah is the only state that outlaws cohabitation between parties as bigamy and because early federal laws enacted in response to polygamy also made cohabitation an element of the crime of bigamy.[8] We disagree.

¶ 25 In accordance with the standards adopted in *Hialeah*, Utah's bigamy statute explains what it prohibits in secular terms, without referring to religious practices. The statute does not on its face mention polygamists or their religion. In addition, the word "cohabit" does not have religious origins or connotations; rather, it is a word of secular meaning. *See The American Heritage Dictionary of the English Language* (4th ed.2000). Green and amici attempt to infuse the word "cohabit" with religious animus, but in doing so they erroneously circumvent and ignore the word's plain meaning.[9] Utah's bigamy statute is not a statute that "refers to a religious practice without a secular meaning discernable from the language." We accordingly hold that it is facially neutral.

¶ 26 "Facial neutrality is not determinative," however. *Hialeah*, 508 U.S. at 534, 113 S.Ct. 2217. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* Therefore, we also must assess the statute's operational neutrality. *Id.* at 535, 113 S.Ct. 2217 ("Apart from the text, the effect of a law in its real operation is strong evidence of its object.").

¶ 27 In *Hialeah*, the Court found that although the city ordinances were facially neutral, they were not neutral in their operation because they accomplished a " 'religious gerrymander' " when applied to the citizens of the city. *Id.* (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)). The ordinances consisted of a series of narrow prohibitions paralleled by exemptions, *id.* at 537, 113 S.Ct. 2217, the net result of which was that "few if any killings of animals [were] prohibited other than Santeria sacrifice," *id.* at 536, 113 S.Ct. 2217. "Indeed," the Court noted, "careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished." *Id.* at 536, 113 S.Ct. 2217.

¶ 28 Utah's bigamy statute does not similarly operate to isolate and punish only that bigamy which results from the religious practices of polygamists. It contains no exemptions that would restrict the practical application of the statute only to polygamists. In fact, the last reported decision of a prosecution under the current bigamy statute in our state courts involved a man who committed bigamy for non-religious reasons. *State v.*

8. Green and amici refer specifically to the Edmunds Act, 22 Stat. 30 sec. 3 (1882).

9. We note additionally that Green and amici are mistaken in their assertion that Utah is the only state that includes cohabitation as an element of the crime of bigamy. *See* Colo.Rev.Stat. § 18–6–201 (2003) ("Any married person who, while still married, marries or cohabits in this state with another commits bigamy...."); R.I. Gen. Laws § 11–6–1 (2003) ("Every person who shall be convicted of being married to another, or of cohabiting with another as husband and wife, having at the time a former husband or wife living, shall pay a fine ...."); *see also* Tex. Penal Code Ann. § 25.01 (Vernon 2003) ("An individual commits an offense if: (1) he is legally married and he: (A) purports to marry or does marry a person other than his spouse in this state, or any other state or foreign country, under circumstances that would, but for the actor's prior marriage, constitute a marriage; or (B) lives with a person other than his spouse in this state under the appearance of being married....").

*Geer*, 765 P.2d 1, 1–2 (Utah Ct.App.1988).[10] We thus find that Utah's bigamy statute is operationally, as well as facially, neutral.

¶ 29 Green and amici argue that to complete our assessment of the statute's neutrality we also must consider the statute's legislative history and the motives and intent of the lawmakers who enacted the statute. The author of *Hialeah* engaged in such an analysis in Part II.A.2 of that opinion. 508·U.S. at 540–42, 113 S.Ct. 2217.[11] Only one other justice, however, joined in Part II.A.2 of *Hialeah*, and two of the remaining seven justices expressly disavowed it. *Id.* at 523, 557–58, 113 S.Ct. 2217.[12] We therefore find that the additional analysis requested by Green and amici is not appropriate, and we move instead to the second requirement of the Free Exercise Clause—the requirement that "laws burdening religious practice must be of general applicability." *Id.* at 542, 113 S.Ct. 2217.

¶ 30 The Court in *Hialeah* did "not define with precision the standard used to evaluate whether a prohibition is of general application." *Id.* at 543, 113 S.Ct. 2217. It did, however, note that "[n]eutrality and general applicability are interrelated," *id.* at 531, 113 S.Ct. 2217, and emphasize the principle that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief," *id.* at 543, 113 S.Ct. 2217. In analyzing the Hialeah City ordinances, the Court found that although the ordinances had stated objectives, they were underinclusive in carrying out those objectives because they punished religious conduct of Santerians while exempting almost all similar secular conduct. *Id.* at 543–45, 113 S.Ct. 2217. The Court observed that the "ordinances 'have every appearance of a prohibition that society is prepared to impose upon [Santeria worshipers] but not upon itself.' " *Id.* at 545, 113 S.Ct. 2217 (alteration in original) (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 542, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989)). The ordinances thus failed the test of general applicability.

¶ 31 As noted above, Utah's bigamy statute does not attempt to target only religiously motivated bigamy. Any individual who violates the statute, whether for religious or secular reasons, is subject to prosecution. *See, e.g., Geer*, 765 P.2d at 3. Thus, Utah's prohibition on bigamy is not a prohibition that our society is "prepared to impose upon [polygamists] but not upon itself." *Hialeah*, 508 U.S. at 545, 113 S.Ct. 2217 (quotation and citation omitted).[13]

¶ 32 It is true that Utah's bigamy statute has an adverse impact on those wishing to practice polygamy as a tenet of their religion. An adverse impact on religion does not by itself, however, prove impermissible targeting because "a social harm may have been a legitimate concern of government for reasons quite apart from [religious] discrimination."

10. Ironically, the defendant in *Geer* argued unsuccessfully that the State selectively prosecuted "only those bigamists who practice bigamy for other than religious reasons." 765 P.2d at 3.

11. Part II.A.2 of *Hialeah* states that "[r]elevant evidence [as to impermissible religious targeting] includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." 508 U.S. at 540, 113 S.Ct. 2217.

12. Justice Scalia, joined by Chief Justice Rehnquist, expressed the following concerning Part II.A.2:

I do not join that section because it departs from the opinion's general focus on the object of the *laws* at issue to consider the subjective motivation· of the *lawmakers*, i.e, whether the Hialeah City Council actually *intended* to disfavor the religion of Santeria. As I have noted elsewhere, it is virtually impossible to determine the singular "motive" of a collective legislative body, and this Court has a long tradition of refraining from such inquiries. *Hialeah*, 508 U.S. at 557–58, 113 S.Ct. 2217 (Scalia, J., concurring).

13. Nor is Utah unique in its prohibition of bigamy. As pointed out by amici, bigamy is a crime in every state. *See, e.g.*, Ala.Code § 13A–13–1 (2003); Cal.Penal Code § 281 (Deering 2003); Colo.Rev.Stat. § 18–6–201 (2003); Conn. Gen. Stat. § 53a–190 (2003); Ga.Code Ann. § 16–6–20 (2003); Idaho Code § 18–1101 (2003); Mich. Comp. Laws Ann. § 750.439 (2003); N.Y. Penal Law § 255.15 (2003); Or.Rev.Stat. § 163.515 (2003); R.I. Gen. Laws § 11–6–1 (2003); Va. Code Ann. § 18.2–362 (2003); Wis. Stat. Ann. § 944.05 (2003).

*Id.* at 535, 113 S.Ct. 2217 (citing *Reynolds,* 98 U.S. 145) (other citations omitted). Indeed, "[i]n many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations," demands "regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

¶ 33 The Utah legislature has determined that prohibiting bigamy serves this state's best interests. Because Utah's bigamy statute is neutral and of general applicability, the State is not required to show that the interests it serves are compelling or that the statute is narrowly tailored in pursuit of those interests. *Hialeah,* 508 U.S. at 531, 113 S.Ct. 2217; *see also Smith,* 494 U.S. at 884–86, 110 S.Ct. 1595. Instead, the State need show only that the statute is rationally related to a legitimate government end. *See Axson–Flynn v. Johnson,* 356 F.3d 1277, 1294 (10th Cir.2004) ("In effect, *Smith* creates a 'safe harbor'—if the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end." (citation and quotation omitted)); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 165 (3d Cir.2002).

¶ 34 Amici argue that Utah's bigamy statute should nonetheless be strictly scrutinized for a compelling interest because the statute violates not only Green's free exercise of religion, but also Green's constitutional rights of privacy and free association, thus presenting a "hybrid situation." "[W]hen a free exercise claim is coupled with some other constitutional claim (such [as] a free speech claim), heightened scrutiny may be appropriate." *Axson–Flynn,* 356 F.3d at 1295 (explaining hybrid rights exception) (citing *Smith,* 494 U.S. at 881–82, 110 S.Ct. 1595). Although his briefing is unclear, Green apparently agrees that we should apply heightened scrutiny, arguing that the statute also violates his constitutional right of free speech.

¶ 35 We cannot address amici's arguments because Green neither preserved nor properly raised or argued any claims alleging violation of constitutional rights to free speech, privacy, or free association. It is a "well-settled rule that an amicus brief cannot extend or enlarge the issues on appeal," and we will consider only "those portions of the amicus brief that bear on the issues pursued by the parties to [the] appeal." *Madsen v. Borthick,* 658 P.2d 627, 629 (Utah 1983).

¶ 36 Green failed to adequately present the issues on which amici rely. For example, Green's claim that Utah's bigamy statute violates his right of free speech consists of nothing more than a bare allegation, with no supporting articulation of how his right of free speech has been infringed. Similarly, the only mention of any case or argument relating to a right of privacy or free association is found in Green's reply brief. We therefore find that Green's appeal does not present a hybrid rights situation, and we need not inquire further into whether heightened scrutiny would be appropriate.

¶ 37 Having concluded that the State need only show a rational relationship between its bigamy law and a legitimate government interest, we assess whether the State has met its burden in this regard. We conclude that Utah's bigamy statute is rationally related to several legitimate government ends. First, this state has an interest in regulating marriage. As stated in *Reynolds,* marriage may be viewed as a type of "civil contract": "Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal." 98 U.S. at 165. Moreover,

> [m]arriage ... has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

*Zablocki v. Redhail,* 434 U.S. 374, 399, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (Powell, J., concurring in judgment).

¶ 38 The State of Utah's interest in regulating marriage has resulted in a network of laws, many of which are premised upon the concept of monogamy. *Potter*, 760 F.2d at 1070 n. 8 (citing several such laws). In *Potter*, the Tenth Circuit found this network itself to evidence a "compelling" state interest in prohibiting bigamous associations. *Id.* at 1070 ("[T]he State of Utah beyond the declaration of policy and public interest implicit in the prohibition of polygamy under criminal sanction, has established a vast and convoluted network of other laws clearly establishing its compelling state interest in and commitment to a system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage.").

¶ 39 Beyond the State's interest in regulating marriage as an important social unit, or in maintaining its network of laws, Utah's bigamy statute serves additional legitimate government ends. Specifically, prohibiting bigamy implicates the State's interest in preventing the perpetration of marriage fraud, as well as its interest in preventing the misuse of government benefits associated with marital status.

¶ 40 Most importantly, Utah's bigamy statute serves the State's interest in protecting vulnerable individuals from exploitation and abuse. The practice of polygamy, in particular, often coincides with crimes targeting women and children. Crimes not unusually attendant to the practice of polygamy include incest, sexual assault, statutory rape, and failure to pay child support. *See* Richard A. Vazquez, Note, *The Practice of Polygamy: Legitimate Free Exercise of Religion or Legitimate Public Menace? Revisiting Reynolds in Light of Modern Constitutional Jurisprudence*, 5 N.Y.U. J. Legis. & Pub. Pol'y 225, 239–45 (2001).[14] Moreover, the closed nature of polygamous communities makes obtaining evidence of and prosecuting these crimes challenging. *See id.* at 243 ("Given the highly private nature of sexual abuse and the self-imposed isolation of poly-

gamous communities, prosecution may well prove impossible. This wall of silence may present a compelling justification for criminalizing the act of polygamy, prosecuting offenders, and effectively breaking down the wall that provides a favorable environment in which crimes of physical and sexual abuse can thrive.").

¶ 41 All of the foregoing interests are legitimate, if not compelling, interests of the State, and Utah's bigamy statute is rationally related to the furthering of those interests. We therefore hold that Utah's bigamy statute does not violate the Free Exercise Clause of the First Amendment of the United States Constitution. Having so determined, we turn our attention to Green's assertion that Utah's bigamy statute is unconstitutionally vague.

### III. VAGUENESS CLAIMS

■■ ¶ 42 Green argues that Utah's bigamy statute is unconstitutionally vague, both as applied to his circumstances and on its face. "Constitutional challenges to statutes present questions of law, which we review for correctness." *Provo City Corp. v. Thompson*, 2004 UT 14, ¶ 5, 86 P.3d 735 (citations omitted). Additionally, "legislative enactments are presumed to be constitutional," and "those who challenge a statute or ordinance as unconstitutional bear the burden of demonstrating its unconstitutionality." *Greenwood v. City of N. Salt Lake*, 817 P.2d 816, 819 (Utah 1991); *see also State v. MacGuire*, 2004 UT 4, ¶ 8, 84 P.3d 1171.

■■ ¶ 43 "[V]agueness questions are essentially procedural due process issues, i.e., whether the statute adequately notices the proscribed conduct." *State v. Morrison*, 2001 UT 73, ¶ 13, 31 P.3d 547 (citation and quotation omitted). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited

14. Green's circumstances illustrate this point. In addition to being convicted of bigamy, Green was also convicted of criminal nonsupport and rape of a child, Linda Kunz, who was thirteen years old at the time of her first sexual association with Green. The potential for conflicts of

consanguinity in polygamous associations is illustrated by Green's relationships. Among Green's "wives" are three sets of sisters and three of his own stepdaughters. For another example, see *State v. Kingston*, 2002 UT App 103, 46 P.3d 761.

and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also State v. Honie*, 2002 UT 4, ¶ 31, 57 P.3d 977. The constitution tolerates a greater degree of vagueness in civil statutes than in criminal statutes. *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "[A] scienter requirement," however, "may mitigate a law's vagueness." *Id.* at 499, 102 S.Ct. 1186.

■ ¶ 44 Although Green raises both "as applied" and "facial" vagueness challenges, we focus on his as applied challenge because Green has failed to convince us that the bigamy statute infringes his First Amendment freedoms or other constitutionally protected conduct. The United States Supreme Court has explained that " '[vagueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.' " *Hoffman*, 455 U.S. at 495 n. 7, 102 S.Ct. 1186 (alteration in original) (quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). Additionally, a court should "examine the complainant's conduct before analyzing other hypothetical applications of the law" when a challenged statute "implicates no constitutionally protected conduct." *Id.* at 494–95, 102 S.Ct. 1186. "A plaintiff who engages in some conduct that is clearly proscribed [by such a statute] cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495, 102 S.Ct. 1186; *see also United States v. Graham*, 305 F.3d 1094, 1105 (10th Cir.2002) ("Moreover, because [appellant's] vagueness challenge does not implicate a First Amendment interest or any other constitutional

right ... he must show that the statute is vague as applied in this case."); *cf. MacGuire*, 2004 UT 4 at ¶ 12, 84 P.3d 1171.

¶ 45 We have held that Utah's bigamy statute does not violate Green's right to free exercise of religion, and as discussed above, we do not address the additional constitutional claims raised solely by amici or inadequately briefed by Green. *Supra* ¶¶ 34–36. We therefore evaluate the statute's vagueness in light of Green's conduct and not according to hypothetical situations not before the court.[15]

¶ 46 We first examine whether the statute is sufficiently definite to have adequately warned Green that his conduct was proscribed. Green argues that the word "cohabit" in the statute is so vague in its meaning that he could not have been aware that his conduct would fall within the purview of the statute. *See* Utah Code Ann. § 76-7-101(1) (1999). According to Green, because "cohabit" is not specifically defined within the statute, the statute left him "in a quandary" over how often he could legally reside with and have sexual contact with the women. We disagree and hold that the word "cohabit" is not vague as applied to Green's conjugal-type associations.

¶ 47 The record is clear that Green intended to create and maintain spousal-type relationships with Shirley Beagley, LeeAnn Beagley, Cari Bjorkman, and Hannah Bjorkman. He referred to each of these women as a wife, regardless of whether a licensed marriage existed. The women likewise considered themselves Green's wives and adopted the Green surname. Green spent nights with each woman on a rotating schedule and succeeded in impregnating these four women eighteen times, collectively. The children born of these associations also

---

15. We note that federal and state courts have approached facial challenges somewhat differently. The Court of Appeals for the Tenth Circuit does not allow facial challenges unless a statute implicates constitutionally protected behavior. *See Graham*, 305 F.3d at 1105; *United States v. LaHue*, 261 F.3d 993, 1004–05 (10th Cir.2001); *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir.1988). In such cases, a party is limited to an as applied challenge. In contrast, we have interpreted federal law to hold that if a statute does not implicate constitutionally protected behavior, a facial challenge can still be made, but the challenge will succeed only if the statute is shown to be vague in *all* of its applications, beginning with its application to the facts at hand. *See MacGuire*, 2004 UT 4 at ¶ 12, 84 P.3d 1171; *Greenwood*, 817 P.2d at 819–20. In this case, either approach would yield the same result because both require an as applied review, and we find that section 76-7-101 is not vague as applied to Green.

use the Green surname. Together, Green and the women undertook spousal and parental obligations. Although Green and the women did not reside in one house, they shared a group of mobile homes, "Green Haven," that possessed common areas for the entire family's use. With these facts in mind, it is difficult to see how Green could be unsure whether he might be "cohabiting" within the meaning of Utah's bigamy statute. Indeed, Green's conduct produced precisely the situation that bigamy statutes aim to prevent—all the indicia of marriage repeated more than once. In light of Green's conduct, we do not find the word "cohabit" to be impermissibly vague.

¶ 48 In addition, Green could find his conduct described in dictionary definitions of the word "cohabit." *See The American Heritage Dictionary of the English Language* (4th ed.2000) (defining "cohabit" as to "live together in a sexual relationship, especially when not legally married"); *Webster's New Dictionary, Concise Edition* (1990) (defining "cohabit" as to "dwell together as, or as if, husband or wife"). This court has similarly defined the word "cohabit" within the context of interpreting a cohabitation clause in a divorce decree. *Haddow v. Haddow*, 707 P.2d 669, 672 (Utah 1985).

¶ 49 In *Haddow*, this court assessed whether cohabitation had occurred by looking for "common residency and sexual contact evidencing a conjugal association." *Id.* Green's conduct, as testified to by him and his "wives," fits squarely within these definitions. In addition, we note that Utah's bigamy statute contains a scienter requirement, which mitigates any existing vagueness. *Hoffman*, 455 U.S. at 499, 102 S.Ct. 1186; Utah Code Ann. § 76–7–101(1) (1999). We thus

> do not accede to [Green's] argument that the word is not precisely defined so as to apprise [him] of the proscribed conduct. Words are symbols of communication and as such are not invested with the quality of a scientific formula. It is enough that they can be construed with reasonable certainty. Beyond that it suffices to add that "one who deliberately goes perilously close

to an area of proscribed conduct shall take the risk that he may cross the line."

*State v. Jordan*, 665 P.2d 1280, 1286 (Utah 1983) (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952)).

¶ 50 Having concluded that the statute is sufficiently definite to have notified Green that his conduct was prohibited, we next examine whether the statute is sufficiently definite so as to discourage arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855; *Honie*, 2002 UT 4 at ¶ 31, 57 P.3d 977. The United States Supreme Court has stated that to avoid unconstitutional vagueness, a statute must "establish minimal guidelines to govern law enforcement" such that it avoids entrusting "lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender*, 461 U.S. at 358, 360, 103 S.Ct. 1855.

¶ 51 Green and amici argue that Utah's bigamy statute affords enforcement officials too much prosecutorial discretion because it does not specifically indicate which of the "myriad of modern living arrangements" should be prosecuted. In an as applied challenge, however, we must focus on the particular conduct at hand and not on the possible conduct of hypothetical parties. *See United States v. LaHue*, 261 F.3d 993, 1007 (10th Cir.2001) ("[I]t is the application of the [challenged statutes] to defendants by law enforcement officials we review; in an 'as applied' examination, defendants may not generalize beyond the conduct with which they are charged.").

¶ 52 We find that law enforcement officials encountering Green's circumstances would not be left to pursue their own personal predilections in determining the applicability of Utah's bigamy statute. As we already have discussed, Green's conduct fell unmistakably within the statute's purview, leaving no room for law enforcement officials to decide, in their discretion, that the statute's provisions should not apply. We therefore hold that Green's vagueness challenge fails. In so holding, we express no opinion as to whether someone in factual circumstances distinguishable from Green's could success-

fully mount a vagueness challenge to Utah's bigamy statute.[16]

## IV. CLAIMS INVOLVING UTAH CODE SECTION 30–1–4.5

¶ 53 We finally address Green's claims involving Utah's unsolemnized marriage statute, Utah Code Ann. § 30–1–4.5 (1999). To successfully prosecute Green under Utah's bigamy statute, the State had the burden of establishing that Green was legally married and then purported to marry or cohabited with another woman. Utah Code Ann. § 76–7–101(1) (1999). In an attempt to bind Green over on the bigamy charges, the State therefore requested a determination by the district court as to whether Green was legally married to Linda Kunz pursuant to section 30–1–4.5. After allowing Linda Kunz to intervene, the district court found that Green and Linda Kunz shared a valid unsolemnized marriage.

¶ 54 Although Green's argument is not clear, he apparently objects to the State's reliance on section 30–1–4.5 as a predicate to his bigamy convictions on the basis that (1) Green had no notice that he could be found legally married under section 30–1–4.5 and subsequently prosecuted for bigamy; and (2) reliance on section 30–1–4.5 improperly intermingled a civil proceeding with a criminal proceeding.

¶ 55 Green provides a single citation to the record to show that he allegedly raised and preserved these claims regarding the use of the unsolemnized marriage statute. That citation is to a memorandum in which Green briefly comments on the "novelty" of using section 30–1–4.5 to further a criminal bigamy prosecution. The State argues that this reference to novelty was insufficient to raise and preserve Green's specific claims on appeal. We need not resolve whether such a reference was sufficient to preserve the issue because we conclude, regardless, that both of Green's claims regarding the unsolemnized marriage statute lack merit.

¶ 56 Green argues first that he had no notice that the State would consider him legally married under section 30–1–4.5. He reasons that he therefore had no notice that would have allowed him to alter his conduct to avoid prosecution for bigamy. Green's argument is belied by the fact that the period for which he was charged and convicted of bigamy (November 1995 to November 2000) included four and a half months *following* the district court's declaration that Green was legally married to Linda Kunz pursuant to the unsolemnized marriage statute. During this time, Green knew the State considered him legally married, but Green did not take advantage of the opportunity to alter his behavior. In addition, the record establishes that Green was aware that section 30–1–4.5 might be used against him in a bigamy prosecution before he was charged by the State.[17]

¶ 57 Green's second argument is that the unsolemnized marriage statute improperly intermingled civil and criminal proceedings. In this regard, we note that this is not the first time a claim under section 30–1–4.5 has been adjudicated in the context of a court proceeding involving a related claim. *See, e.g., Clark v. Clark,* 2001 UT 44, ¶¶ 1–3, 27 P.3d 538 (involving a petitioner who sought a declaration of marriage under section 30–1–4.5 in order to obtain a divorce and divide marital assets); *In re Marriage of Gonzalez,* 2000 UT 28, ¶¶ 1–2, 1 P.3d 1074 (involving a petitioner who filed for an adjudication of marriage under section 30–1–4.5 in order to determine whether she could claim benefits under a former cohabitant's insurance policy); *State v. Johnson,* 856 P.2d 1064, 1068–69 (Utah 1993) (addressing the appeal of a criminal defendant who sought a declaration of marriage under section 30–1–4.5 in order to qualify for probation under another statute,

---

**16.** Indeed, we can envision situations in which application of the word "cohabit" could be problematic, and the statute might therefore deserve legislative consideration.

**17.** According to the record, Green spoke with attorneys concerning section 30–1–4.5 two months prior to any charges being filed. Approximately one year before the charges were filed, Green wrote a letter referencing section 30–1–4.5 and raising the possibility that he could be considered legally married to the mothers of his children. In addition, Linda Kunz testified that she was aware of section 30–1–4.5 and had discussed it with Green before Green was charged with bigamy.

and noting that "the trial court could have made the requisite factual determinations and entered an order establishing the relationship as a valid marriage when it decided whether [the defendant] was entitled to probation"); *see also Whyte v. Blair*, 885 P.2d 791, 792 (Utah 1994); *Kelley v. Kelley*, 2000 UT App 236, ¶¶ 1–11, 9 P.3d 171. Nothing in the plain language of the statute or prior cases involving the statute indicates that it would be improper to rely on the statute in any proceeding in which the existence or validity of a marital association is a material issue.

¶ 58 Finally, Green alleges that the combination of a civil proceeding followed by a criminal proceeding allowed the State to enjoy a relaxed evidentiary burden at trial. Green claims that the jury found him legally married to Linda Kunz based on a preponderance of the evidence standard because the district court applied that standard in finding the existence of a marriage under section 30–1–4.5. Green's argument is without basis in the record.

¶ 59 In Green's criminal trial, the jury was instructed that, in order to find Green legally married under section 30–1–4.5, it had to find that each element of the statute was satisfied "beyond a reasonable doubt." The State thus did not enjoy, and Green was not convicted under, a lesser standard of proof.

### CONCLUSION

¶ 60 We affirm the district court and hold that (1) Utah's bigamy statute does not violate Green's federal constitutional right to free exercise of religion; (2) Utah's bigamy statute is not unconstitutionally vague as applied to Green's conduct; and (3) the State's use of Utah's unsolemnized marriage statute to establish a legal marriage between Green and Linda Kunz was not inappropriate.

¶ 61 Associate Chief Justice WILKINS and Justice DURRANT concur in Justice PARRISH's opinion.

DURHAM, Chief Justice, concurring:

¶ 62 I am constrained to concur with Justice Parrish's analysis of the application here of the "adjudicated marriage" statute and thus with the result of the majority opinion. I write separately to express my deep misgivings about the due process implications (not raised or briefed in this case) of using a statute designed to create civil liability for family support to establish the predicate for criminal behavior. Green took calculated and deliberate steps to avoid violation of the bigamy statute. He never attempted to enter into more than one civil marriage at a time, going to great lengths to dissolve, by divorce, one legal marriage before entering into another. In that regard, his behavior differs little from that of many citizens who (for non-religious reasons) set up households with new partners while still legally married to others, and remarry after divorce, if at all. It was only the action of the State, undertaken pursuant to the adjudicated marriage statute, that rendered his behavior criminal. Absent the application of a party for an adjudication of marriage pursuant to the statute, no legal marriage exists, and Green could not have been prosecuted. The analogy to the doctrine of entrapment, where a defendant is caused by agents of the state to commit acts he would not otherwise have committed, seems to me to be very strong. Here, it was only the prosecutors' application for an adjudication of marriage that created the necessary predicate for criminal bigamy, one that Green most probably, given his course of conduct, did not intend to create himself, and may not have even known was possible. Such a result strikes me as, at best, unfair.

¶ 63 I also note that I find myself generally in agreement with the views on free exercise expressed by Justice Durrant's concurring opinion, and observe that they may have significant relevance should this court be asked to develop its own jurisprudence under the religion clauses of the Utah Constitution. *See generally* Christine M. Durham, *What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*, 38 Val. U.L.Rev. 353 (2004) (discussing ways in which state constitutional religion clauses, given their history and language, may afford more hospitable venues to litigants in religious liberty cases).

¶ 64 Justice NEHRING concurs in Chief Justice DURHAM's concurring opinion.

DURRANT, Justice, concurring:

¶ 65 In reaching its conclusion that Utah's bigamy statute does not violate the Free Exercise Clause, the majority applies the rational basis standard articulated by the United States Supreme Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), a standard under which a neutral and generally applicable law need not be justified by a compelling governmental interest, even if the law has the incidental effect of burdening a particular religious practice. Although I acknowledge that we are bound in our decision today to follow this authority, and therefore concur in the majority opinion, in my view, *Smith's* evisceration of the protections afforded the free exercise of religion is contrary to the explicit language and the purpose of the Free Exercise Clause. Consequently, I write separately to clarify what I believe to be the proper level of scrutiny applicable to governmental interference with the constitutionally protected freedom to freely exercise one's religious beliefs.

¶ 66 In a long line of cases prior to *Smith*, the Supreme Court "respected both the First Amendment's express textual mandate and the governmental interest in regulation of [religious] conduct by requiring the government to justify any substantial burden on religiously motivated conduct by a compelling state interest and by means narrowly tailored to achieve that interest." *Id.* at 894–95, 110 S.Ct. 1595 (O'Connor, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring) (citing *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *McDaniel v. Paty*, 435 U.S. 618, 626–29, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (plurality opinion); *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). In *Smith*, however, the Court all but abandoned the strict scrutiny standard in the context of free exercise claims, concluding that a generally applicable and neutral law need only satisfy rational basis review. *See id.* at 878–80, 110 S.Ct. 1595.

¶ 67 The *Smith* Court's abrupt departure from analyzing religious exercise issues under a strict scrutiny standard has been widely criticized by courts and commentators alike, primarily on the basis that the majority opinion is unsupported by either history or precedent. *See, e.g., City of Boerne v. Flores*, 521 U.S. 507, 546–48, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (O'Connor, J., joined by Breyer, J., dissenting) (arguing that *Smith* "adopted an improper standard for deciding free exercise claims"); *id.* at 565–66, 117 S.Ct. 2157 (Souter, J., dissenting) ("I have serious doubts about the precedential value of the *Smith* rule and its entitlement to adherence."); *Combs v. Corr. Corp. of Am.*, 977 F.Supp. 799, 802 n. 1 (W.D.La.1997) ("In that *Smith* reduces the First Amendment to a paper tiger and repudiates a long history of carefully crafted free exercise jurisprudence, we agree with the [*City of Boerne*] dissenters."); James D. Gordon III, *Free Exercise on the Mountaintop*, 79 Cal. L.Rev. 91 (1991); Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi. L.Rev. 1109 (1990). Although I generally agree with these criticisms, and add my voice to the chorus of those calling for a re-examination of *Smith*, I do not repeat them here. Rather, I highlight what I believe to be an additional flaw in the *Smith* decision; namely, the inherent logical fallacy of applying rational basis review to an explicit constitutional protection while subjecting governmental interference with certain other unenumerated rights to more exacting scrutiny.

¶ 68 In an extensive line of cases, the Supreme Court has interpreted the Due Process Clause as providing heightened protection against governmental interference with the right of privacy, a right not expressly provided for in the Constitution. My purpose here is not to challenge the Supreme Court's right of privacy jurisprudence (al-

though I do find it to be questionable in many respects), but to note the logical and theoretical inconsistency in affording more protection to an implicit "penumbral" right than to one explicitly protected by the Constitution's framers. In my view, *Smith* is made all the more indefensible by the fact that it has expelled the right to free exercise from the table of civil liberties, while the implicit right of privacy has been afforded a seat of honor.

¶ 69 The irony created by the juxtaposition of these differing standards is readily apparent from the facts in this case. As the majority correctly notes, had Green adequately briefed his argument with respect to a right of privacy, he would have been provided a greater degree of protection under an *implicit* right of privacy than he was under the *explicit* right to free exercise.

¶ 70 In short, *Smith* has essentially rewritten the Free *Exercise* Clause into the Free *Belief* Clause, a result that I believe to be inherently flawed. Because an implicit right of privacy should not be afforded greater protection than an explicit right to the free exercise of religion—a concept upon which our country was founded and a protection deeply ingrained in the hearts and minds of American citizens—a state should not be allowed to burden religiously motivated conduct unless the state's interest is compelling and the burden is narrowly tailored to achieve that interest.[1]

¶ 71 That being said, I believe Utah's bigamy law is supported by a compelling state interest for several of the reasons briefly touched on in the majority opinion. First and foremost, the State has a compelling interest in regulating and preserving the institution of marriage as that institution has been defined by the State. The Supreme Court has made clear that the right to marry is a fundamental right, the interference with which is appropriately the subject of heightened scrutiny. *Zablocki v. Redhail*, 434 U.S. 374, 383, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). However, the marital relationship itself is "not merely a private romantic declaration or religious right." Maggie Gallagher, *What is Marriage For? The Public Purposes of Marriage Law*, 62 La. L.Rev. 773, 774 (2002). Rather, it is a civil contract, *Andrews v. Andrews*, 188 U.S. 14, 30, 23 S.Ct. 237, 47 L.Ed. 366 (1903); *Meister v. Moore*, 96 U.S. 76, 78–79, 24 L.Ed. 826 (1878), and " 'a relationship in which the state is vitally interested.' " *Norton v. Macfarlane*, 818 P.2d 8, 18 (Utah 1991) (Howe, J., concurring and dissenting) (quoting *Fennell v. Littlejohn*, 240 S.C. 189, 125 S.E.2d 408, 412 (1962)). "Indeed, 'marriage is a state-conferred legal status, the existence of which gives rise to the rights and benefits reserved exclusively to that particular relationship.' " *Universal Life Church v. State*, 189 F.Supp.2d 1302, 1315 (D.Utah 2002) (quoting *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44, 58 (1993)). It is precisely because marriage is a state-created institution that states have a compelling interest in defining the parameters of marital relationships, and in regulating the procedures, duties, and rights that stem from those relationships. *See id.* ("It is clear that states have an absolute right to prescribe the condition upon which marriage shall be created."); *Bond v. Trustees of the STA–ILA Pension Fund*, 902 F.Supp. 650, 655 (D.Md.1995) ("[T]he definition and regulation of marriage is a traditional area of state authority."); *Salisbury v. List*, 501 F.Supp. 105, 107 (D.Nev.1980) ("The state

---

1. I would apply strict scrutiny not only to free exercise claims under the United States Constitution, but to claims under the Utah Constitution as well. *See* Utah Const. art. I, § 4 ("The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. . . ."). I do note, however, that because plural marriages are expressly prohibited by the Utah Constitution, *see* Utah Const. art. III, any free exercise claim asserting the right to enter into bigamous or polygamous relationships would, under a state constitutional analysis, be subject to a different standard of review.

For an excellent article discussing the use of state constitutions to fill the free exercise protectional void created by *Smith,* see Christine M. Durham, *What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*, 38 Val. U.L.Rev. 353 (2004).

legislatures may control the qualifications of the contracting [marital] parties, the forms or procedures necessary to solemnize the marriage, the duties and obligations it creates, its effect upon property rights, and the grounds for dissolution."); *Estate of De-Passe*, 97 Cal.App.4th 92, 118 Cal.Rptr.2d 143, 148 (Ct.App.2002) ("The state has a vital interest in the institution of marriage and plenary power to fix the conditions under which the marital status may be created...."); *In re Marriage of Franks*, 189 Colo. 499, 542 P.2d 845, 850 (1975) ("The institution of marriage has always been peculiarly a creature of the state, and subject to regulation by its legislature."); *Hendrick v. Hendrick*, 1999 OK CIV APP 15, ¶ 9, 976 P.2d 1071 ("Marriage ... [is a] creature[ ] of statute with the State having exclusive control over the establishment, maintenance and termination of the marital relationship."); *see also Hodgson v. Minnesota*, 497 U.S. 417, 435, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) ("State regulation of ... marriage is obviously permissible....").

¶ 72 Moreover, the concept of marriage possesses "undisputed social value." *In re Marriage of Mehren & Dargan*, 118 Cal. App.4th 1167, 13 Cal.Rptr.3d 522, 523 (Ct. App.2004) (internal quotation omitted). Marriage, as that institution has been defined in our country for centuries, is the very "foundation of the family and of society." *Maynard v. Hill*, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888); *see also Norton*, 818 P.2d at 18 (Howe, J., concurring and dissenting); *Borelli v. Brusseau*, 12 Cal.App.4th 647, 16 Cal.Rptr.2d 16, 22 (Ct.App.1993) (Poche, J., dissenting) ("[T]he structure of society itself depends in large part upon the institution of marriage."). Justice Powell once observed that "[t]he State, representing the collective expression of moral aspirations, has an undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people." *Zablocki*, 434 U.S. at 399, 98 S.Ct. 673 (Powell, J., concurring in judgment). Because the State of Utah has defined marriage, with all of its attendant legal benefits and obligations, to encompass only monogamous relationships, it has a compelling interest in preserving the integrity of that state-created and state-sanc-

tioned marital institution. *See Potter v. Murray City*, 760 F.2d 1065, 1070 (10th Cir. 1985) (noting that because the State of Utah "has established a vast and convoluted network of ... laws ... based exclusively upon the practice of monogamy as opposed to plural marriage," it "is justified by a compelling interest in upholding and enforcing its ban on plural marriage to protect the monogamous marriage relationship" (quotations omitted)). Accordingly, the State has a compelling interest in prohibiting conduct, such as the practice of polygamy, which threatens that institution.

¶ 73 Associate Chief Justice WILKINS concurs in Justice DURRANT's concurring opinion.